**Willie H. BOZEMAN, as legal representative of the Estate of Mario Haggard, deceased, Plaintiff,**

v.

**Silas ORUM, III, et al., Defendants.**

No. Civ.A. 00–T–1368–N.

United States District Court, M.D. Alabama, Northern Division.

April 12, 2002.

G. Griffin Sikes, Jr., G. William Gill, Joseph C. Guillot, McPhillips, Shinbaum & Gill, Montgomery, AL, for Plaintiff.

Constance Caldwell Walker, Thomas T. Gallion, III, Haskett Slaughter Young & Rediker LLC, Montgomery, AL, Robert M. Weinberg, John W. Adams, Jr., Thomas Means Gillis & Seay PC, Montgomery, AL, James Eugene Williams, James Flynn, Melton, Espy, Williams & Hates, P.C., Montgomery, AL, for Defendants.

### ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Willie H. Bozeman, as legal representative of the estate of Mario Haggard, asserts federal and state-law claims arising out of the death of Haggard, a pretrial detainee at the Montgomery County Detention Facility, Montgomery, Alabama; she asserts constitutional claims under the fourth, eighth, and fourteenth amendments to the United States Constitution (as enforced through 42 U.S.C.A. § 1983), as well as a state-law medical-malpractice claim under the Alabama Medical Liability Act, Ala.Code 1975 §§ 6–5–480 to –488, and 6–5–540 to –552. Defendants Silas Orum, III, James Thrift, Darryl N. Wood, Jeffrey Sanderson, and Clarence Wilson are correctional officers at the detention facility, and defendants Vollie Boddie and Carmelita McElroy are on the nursing staff. Defendant Baptist Health Services provided McElroy to the detention facility pursuant to a nursing services contract. Defendants Larry Haverland, Gina Savage, and Wanda Robinson are supervisors at the facility, and defendant D.T. Marshall is the Sheriff of Montgomery County, where the facility is located.

This court has jurisdiction over the claims in this lawsuit on the basis of 28 U.S.C.A. §§ 1331 (federal question),

1343(a)(3) and (4) (civil rights), and 1367 (supplemental). Count One of the plaintiff's complaint alleges that the correctional officers used unreasonable deadly force in violation of the fourth and fourteenth amendments.[1] Count Two charges deliberate indifference to Haggard's serious medical needs, both by the nurses for not recognizing and treating his mental illness and by the officers for failing to attempt to resuscitate him or to obtain medical assistance for him. Count Three seeks to impose liability on the Montgomery County Detention Facility leadership for the failure to train or supervise employees as to various policy issues. Count Four is a state-law claim against Baptist Health Center and Nurse McElroy, based on the Alabama Medical Liability Act, alleging a breach of the applicable nurse's standard of care in the treatment of Haggard. The case is currently before the court on the summary-judgment motions of the defendants. The motions will be granted as to all claims except the medical-needs claim against the correctional officers.

## I. SUMMARY–JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the

non-moving party to demonstrate why summary judgment would not be proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of the pleadings. Fed.R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. APPROPRIATE EVIDENCE

Several pieces of proof submitted by the plaintiff are challenged by the defendants as lacking the evidentiary quality necessary for their consideration by this court for purposes of summary judgment.[2] Specifically, the defendants point to unsworn affiants and hearsay statements, as well as unauthenticated and incomplete documents, presented by the plaintiff in opposition to summary judgment.

---

1. The relevant complaint is the third amended complaint, filed by the plaintiff on September 24, 2001 (Doc. no. 76).

2. This evidence was the subject of a motion to strike filed by defendants on October 15, 2001 (Doc. no. 100). That motion was denied by this court on November 20, 2001 (Doc. no. 122), and a reconsideration motion filed on December 5, 2001 (Doc. no. 126), was denied on December 7, 2001 (Doc. no. 127), with assurance given to the defendants in both instances that their arguments as to the weight of this evidence would be pondered at summary judgment.

Affidavits submitted in support or opposition to a summary-judgment motion must be based on personal knowledge, setting forth admissible facts, and shall show that the affiant is competent to testify. Fed. R.Civ.P. 56(e). The use of the word "affidavit" in Rule 56 (an affidavit being by definition a sworn witness statement) per force bars unsworn witness statements from consideration.

■ In addition, the general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999). However, if this hearsay can be "reduced to admissible form" at trial, it may be considered. *Id.* at 1323 (citing several cases). Even though a document, deponent, or affiant references hearsay information, that information may be considered on summary judgment if it would be admissible at trial under an exception to the hearsay rule or as non-hearsay. *Id.* at 1323–24.

■ Generally, documents must ·be properly authenticated in order for them to be considered on summary judgment. *Burnett v. Stagner Hotel Courts, Inc.*, 821 F.Supp. 678, 683 (N.D.Ga.1993). However, it makes sense that unauthenticated documents may be considered when no objection is made or when it is apparent that those documents can be reduced to admissible, authenticated form at trial.

### A. Mt. Meigs Medical Records

■ The defendants argue that the medical records from the Alabama Department of Youth Services facility at Mt. Meigs, Alabama have not been authenticated and are incomplete. Therefore, according to the defendants, the records should not be consulted by the court in deciding the pending motions. However, it is apparent that these records could easily be authenticated at trial, and, indeed, the plaintiff has even presented an admission from the defendants that the records are those of Haggard. *Cf.* Fed. R.Evid. 1007 ("Contents of writings, recordings, or photographs may be proved by the testimony or deposition of the party against whom offered or by that party's written admission, without accounting for the nonproduction of the original."). As to the completeness requirement, it seems antithetical to require the plaintiff to present a substantial amount of documents upon which she does not specifically rely when the defendants certainly have had an opportunity to highlight and themselves present any critical information not contained in the plaintiff's excerpt. The court does not require complete copies of every deposition to be submitted if the relevant portions of those depositions are highlighted for the court; there is no reason not to extend that practical principle to this evidence.

### B. Witness Statements Compiled by the Alabama Bureau of Investigation

■ The plaintiff attempts to rely upon statements of inmates taken as a component of an inquiry into Haggard's death by the Alabama Bureau of Investigation. The court agrees with the defendants that these statements should not be considered for purposes of the summary-judgment motions. These unsworn statements do not meet the requirements for an affidavit that may be considered under Rule 54(c). *Brewer v. City of Daphne*, 111 F.Supp.2d 1299, 1303 (S.D.Ala.1999) (finding that inmate statements contained in an Alabama Bureau of Investigation report were not competent evidence at summary judgment).

This outcome is correct, despite the plaintiff's submission of a certificate of authenticity by the Alabama Bureau of Investigation as to the investigative file as a whole and despite the public-records ex-

ception to the hearsay rule found at Fed. R.Evid. 803(8). A certificate of authenticity does not cast any light on the underlying hearsay problem of the statements or their fundamental flaws as affidavits under Fed.R.Civ.P. 56(e). Simply, the hearsay problem here contains two layers: the report itself and the statements contained therein. Furthermore, although Fed. R.Evid. 803(8)(C) allows the introduction of *"factual findings* resulting from an investigation made pursuant to authority granted by law" (emphasis added), the plaintiff is not introducing the findings from an investigation, but rather the evidence gathered by the investigating body on which to base its findings. Such information is not covered by the hearsay exception cited.

### C. Testimony of Dr. James Lauridson

▇ The court agrees with the defendants that Dr. James Lauridson's testimony as to the time that the officers knew that Haggard was not breathing is entirely based on hearsay. This particular hearsay testimony cannot be reduced to admissible form at trial; that is, Dr. Lauridson could not testify to this information under any hearsay exception and the information does not seem to be presented for a non-hearsay purpose.[3] Therefore, that portion of Dr. Lauridson's testimony will not be considered in ruling on the pending motions.

The plaintiff's arguments on this point are misplaced. Dr. Lauridson may be qualified to testify as an expert in this case, particularly with regard to the cause and sequence of Haggard's death, and may, correlatively, be able to testify to otherwise inadmissible evidence used in forming his expert opinions on these matters. However, there is no basis in the evidentiary record for drawing the conclusion that this particular information was relied upon by him in forming his expert opinion as to the death of Haggard. Rather, great detail concerning the physical condition of Haggard's body seems to support those conclusions. Nor, to this court's knowledge, has Dr. Lauridson been unambiguously identified as the expert charged with establishing a timetable for Haggard's unconsciousness and death.

Furthermore, even if Dr. Lauridson *did* use this information in creating a relevant opinion as to these issues, it is markedly unclear to the court that this type of information would be admissible; that is, the court doubts that this information is the sort "reasonably relied upon" by this type of expert in making this conclusion or that the information should not be barred from the jury's ears based on a weighty helping of prejudice and only minimal probative value. Fed.R.Evid. 703.

### D. Inmate Depositions

The court agrees with the defendants that some of the excerpts from the depositions of inmates Toney, Cobb, Johnson, Watkins, and Little are patently instances of hearsay that will not be admissible at trial. In addition, portions of this testimony indicate that the witnesses were not basing their recollection on personal knowledge of the events as is required under Fed.R.Civ.P. 56(e). To the extent that the testimony does implicate these concerns, these statements will not be considered at this point in the proceedings.

### E. Jail Standards

The plaintiff inserts into her argument several volumes of regulations and standards that the defendants argue are irrelevant to the resolution of this lawsuit. The court tends to agree, as the central question in this lawsuit is not the negligence of the defendants, to which a customary standard may be applicable, but the violation of

---

**3.** No predicate has been laid for this evidence to be admissible under the party-opponent non-hearsay rule; Dr. Lauridson does not identify the maker of the statement.

clearly established law by the defendants resulting in harm to Haggard. *Belcher v. City of Foley,* 30 F.3d 1390, 1399 (11th Cir.1994). Therefore, the standards cited by the plaintiff will be ignored for purposes of finding clearly established law as to the federal constitutional claims. However, these standards could conceivably be relevant to whether the defendants' actions during the incident otherwise constitute a violation of federal law or state medical malpractice laws, and the court may consult the standards for those purposes.

### III. FACTS

Based on the relevant standards and with due consideration to the limitations discussed above, the facts of this case for summary-judgment purposes are as follows.

On August 18, 1999, Haggard, a 17–year–old pretrial detainee, was transferred to the Montgomery County Detention Facility from the Alabama Department of Youth Services facility at Mt. Meigs, to be held pending trial on escape charges. Earlier in August 1999, Haggard and another juvenile escaped from Mt. Meigs by driving away in an unattended vehicle.

The transfer to the Montgomery County Detention Facility was pursuant to court order, the Family Court of Montgomery County having found that Haggard could not be appropriately disciplined in the juvenile system and that, as there were no reasonable grounds to believe that Haggard was committable to an institution for the mentally ill or infirm, he should be transferred to an adult institution pending trial.[4] Haggard was placed among the general inmate population in Cell 4E–9, a cell block reserved for inmates convicted of serious crimes or having known escape tendencies.

During intake, Nurse McElroy gave Haggard an initial medical screening. Haggard told McElroy that he had a history of mental illness and was currently prescribed medications for rest.[5] According to the form completed by McElroy at this screening, Haggard indicated that although he had been tested for mental health problems, these were "evaluations only," and that he was prescribed medication "for rest" while at Mt. Meigs.[6] Haggard did not know the name of the medication he was taking at Mt. Meigs. According to McElroy, although it was the policy of the Montgomery County Detention Facility to obtain the prisoner's medical records if he indicated that he was currently on medication, she decided not to request the records in Haggard's case because he said that he was on medication "for rest," and it was the policy of the detention facility not to give medication for rest.

Nurse McElroy also recorded her own visual impressions of Haggard, noting that his appearance and attitude did not suggest that he was a suicide risk. The Montgomery County Detention Facility does have a policy of isolating suicide risks for observation and ordering a mental evaluation on those inmates as soon as possible; however, because McElroy did not note such a risk, no such isolation or evaluation occurred.

---

4. Defs.' Mot. for Sum.J., Exh. (Order of Transfer), attached to affidavit of Larry Haverland.

5. Pl.'s Opp'n to Mot. for Sum.J., Exh. 17 (Admission Data—Inmate's Medical Record). Haggard's initial intake paperwork, signed by Officer "Davis," does not indicate a mental health problem. "No" is circled on this form

in response to "Suicide Tendencies/Ideations" and "Mental Health Problems." However, "Yes" for "Past treatment for mental health problems," and "Yes" for "Use of Psychotropic Medication is indicated." *Id.,* Exh. 10 (Montgomery County Detention Facility 2–4 Intake Classification).

6. *Id.* Exh. 17.

In fact, as recently as June 1999, Haggard was diagnosed as "psychotic" by a licensed Alabama psychologist and placed on antipsychotic medication based in some part on Haggard's hyper-religious behavior.[7] No one at the detention facility followed up on Haggard's disclosures by determining the type of medication he was prescribed or by discovering the results of the mental-health evaluation or the extent of any mental illness Haggard may have suffered, and, consequently, no one at the detention facility knew of the earlier diagnosis.[8] Though Haggard signed a release allowing the detention facility to obtain his medical records, those records were never obtained.

There were simply no procedures in place to determine upon intake whether a non-suicidal inmate should be referred for mental-health evaluation or treatment.[9] Nurse Vollie Boddie, the highest ranking medical professional on site, made decisions as to subsequent mental-health care for inmates in consultation with Captain Robinson and Director Haverland.[10] The three nurses on the regular medical staff at the detention facility (Boddie, Rainey [11] and McElroy) did not have any significant mental-health training.[12] Nor was a mental-health professional employed by or on call to the detention facility.[13] Haggard made no request for and did not receive medication or mental-health treatment while detained at the facility.[14]

On October 11, 1999, between 4:00 a.m. and 5:00 a.m., Haggard had what was apparently a mental breakdown in his cell. He stripped his clothes off and flooded the area by stopping up the commode. While shouting phrases like "the blood of Jesus is on me" and "Jesus come get me," Haggard dipped his face and head in the water in the commode.[15] He also tied a string around his neck in an apparent though futile attempt to strangle himself, as the string was by no means strong enough to support his weight.[16]

Correctional officers responded to the disturbance in Haggard's cell almost immediately. Although the officers attempted to calm Haggard down from outside the cell, their attempts were unsuccessful. Therefore, a decision was made to enter the cell. Inmate Jeremy Medders, who was in the cell adjacent to Haggard, said that the officers told Haggard that if they had to come into his cell, they were going to "kick his ass." [17]

---

7. *Id.*, Exh. 51, at 2.

8. *Id.* Exh. 68, at 30–32 (Deposition of Carmelita McElroy).

9. *Id.*, Exh. 69, at 66–68 (Deposition of Vollie Boddie).

10. *Id.* at 131–34.

11. Shirley Rainey was voluntarily dismissed as a defendant in this case, by order of the court on September 26, 2001 (Doc. no. 79).

12. *Id.* at 40–41, 56–57.

13. Deposition of Vollie Boddie, at 22–23, 27, 62–63.

14. *Id.* Exh. 67, at 88 (Deposition of Shirley Rainey).

15. *Id.*, Exh. 60, at 92–93, 101, 117, 123, (Deposition of James Thrift); *Id.*, Exh. 61, at 45 (Deposition of Darryl Wood); *Id.* Exh. 62, at 43–44 (Deposition of Jeffrey Sanderson).

16. Deposition of Thrift, at 109; Deposition of Orum, at 39.

17. Pl.'s Second Supp. Opp'n to M. for Summ. J., Exh. at 56–57 (Deposition of Jeremiah Medders). The officers say that their goal in entering the cell was to subdue Haggard and remove him to an isolation cell to prevent him from harming himself and for eventual medical treatment. Deposition of Thrift, at 112; Deposition of Wood, at 45; Deposition of Sanderson, at 42.

Several inmates stated that they heard what sounded like someone getting punched or slapped, and one of the officers saying to Haggard "Is that all you got?"[18] Fellow inmates reported hearing sounds that indicated to them that someone was being slammed on the bed in the cell.[19] Inmates also heard a choking sound, like someone was having difficulty breathing.[20] According to the officers, they were eventually able to subdue Haggard on his bunk and place handcuffs on him.[21]

Haggard was eventually handcuffed, shackled, and removed from the cell. According to inmates, Haggard was not moving when they removed him from the cell; he looked unconscious or dead.[22] At this point, inmate Cobb said that the officers, particularly officer Orum, kept saying "damn, damn, damn" and looked panicked.[23]

Haggard was carried out, face-down and covered by a sheet, by four officers, with an officer on each arm and on each leg, using batons passed through the shackles and handcuffs.[24] This method of carrying Haggard would have made his weight bear down on his upper body and chest, restricting his ability to breathe. None of the officers knew that this method of carrying Haggard could cause him to asphyxiate; nor did they receive any training that suggested their actions could result in serious harm to Haggard. Indeed, the officers had been trained to carry inmates using this method.

The officers carried Haggard from his cell in 4E to the 4 North hallway, a trip that took approximately 14 minutes.[25] The time was lengthened by a locked door that the officers had trouble opening.

Upon arriving at the 4 North hallway, the officers claim that they first noticed that Haggard was not breathing.[26] They

**18.** Pl.'s Third Supp. Opp'n to M. for Summ.J., Exh. 7, at 30–31, 33 (Deposition of Curtis Westbrook); Deposition of Medders, at 58–59.

**19.** Deposition of Medders, at 58–60; Pl.'s Third Supp. Opp'n to M. for Summ.J., Exh. 5, at 32 (Deposition of Herman Cobb).

**20.** Deposition of Westbrook, at 55; Deposition of Medders, at 61. All of the officers deny striking Haggard or that Haggard struck any of them. Deposition of Thrift, at 124; Deposition of Wood, at 63; Deposition of Sanderson, at 56–57; Deposition of Orum, at 46.

**21.** The autopsy suggests that some force was applied while Haggard was on the bunk and that the force prevented Haggard from breathing. Although the officers admit that they subdued Haggard on his bunk, they deny that they climbed onto or pushed down on Haggard's back to facilitate his handcuffing, but rather they only held down his shoulders, legs, and arms. Deposition of Thrift, at 146, Deposition of Sanderson, at 52–53.

**22.** Deposition of Cobb, at 64, 68; Deposition of Medders, at 62. According to the officers, Haggard was still resisting as he was being carried out of the cell.

**23.** Deposition of Cobb, at 58, 63.

**24.** Pl.'s Opp'n to M. for Summ.J., Exh. 76 (Videotape of October 11, 1999, incident). According to the officers, Haggard was carried out of his cell because he was non-compliant and was resisting being escorted out by the officers.

**25.** *Id.* A shorter route was available, but the officers took the longer route, either for safety reasons or to avoid the other inmates, depending on whose story you believe. The officers say they used the longer route because the stairwell in that direction was wider, dry, and less steep than the wet metal steps near Haggard's cell. The inmates say that the officers used the longer route to hide the fact that Haggard was not moving.

**26.** There is, of course, a question as to whether the officers knew or should have known before this time that Haggard was not breathing and, indeed, there is a question as to at what point Haggard became unconscious and stopped breathing. In the context of these motions for summary judgment, the court has highlighted the evidence tending to show Haggard's unconsciousness before he was removed from the cell. However, the officers

called Nurse Rainey, who arrived two minutes later.[27] She began CPR, assisted by several officers, and paramedics were called to the scene. All attempts to resuscitate Haggard were unsuccessful. Haggard was transported to Baptist Hospital, and life support efforts were discontinued at 7:28 a.m.

An autopsy performed by Dr. James Lauridson indicated abrasions on the inner part of Haggard's upper and lower lips that could have been caused by Haggard's teeth being forced against his lips.[28] Lauridson is of the opinion that these abrasions are consistent with Haggard's head being forced into his bunk during the efforts to subdue him, causing a restriction in his ability to breathe.[29] Other symptoms, including swelling of the brain (cerebral edema) and fluid buildup in Haggard's lungs, also indicated that Haggard's ability to breathe was constrained at some point during or throughout the struggle.[30] The autopsy indicated that the cause of death was asphyxia.[31]

## IV. DISCUSSION

### A. Excessive Force Claim (Count One)

Count One of the complaint alleges that the correctional officers unreasonably used deadly force against Haggard in violation of the fourth and fourteenth amendments. For the reasons below, summary judgment is appropriate as to this claim. As the defendants have raised the defense of qualified immunity, the court will first outline the contours of that defense, which will remain relevant throughout this opinion, before delving into the substantive violations claimed.

### 1. Qualified Immunity

The doctrine of qualified immunity insulates government agents from personal liability for money damages for actions taken in good faith pursuant to their discretionary authority. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Greason v. Kemp,* 891 F.2d 829, 833 (11th Cir.1990). As established by the Supreme Court in *Harlow,* the test for good faith or qualified immunity turns primarily on the objective reasonableness of the officials' conduct in light of established law: "governmental officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Where the law that the defendants allegedly violated was not clearly established at the time of the alleged offense, the defendants are entitled to qualified immunity. *Id.* at 807, 102 S.Ct. at 2732; *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990). If the law was clearly established, however, the immunity defense will fail since "a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

A two-step analysis is followed to determine whether public officials are entitled to qualified immunity. *Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236

---

first admit to realizing that Haggard was not breathing upon their arrival in the 4 North hallway.

**27.** Videotape of October 11, 1999, incident.

**28.** Pl.'s Opp'n to M. for Summ.J., Exh. 57, at 10, 14 (Grand Jury Testimony of Dr. James Lauridson).

**29.** *Id.* at 14.

**30.** *Id.* at 12–14.

**31.** *Id.* at 13.

(11th Cir.1992). First, the defendants must prove that they were acting within the scope of their discretionary authority at the time of the allegedly unconstitutional conduct. *Id.* Once this is shown, the burden shifts to the plaintiff to prove that the defendants' actions violated clearly established statutory or constitutional law. *Id.; Busby v. City of Orlando,* 931 F.2d 764, 773 (11th Cir.1991); *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1322 (11th Cir.1989).

As the Supreme Court recently indicated, the preferred mode of analyzing whether statutory or constitutional law was clearly established is as follows: first, the court must "determine ... whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998); *see also Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all," and courts should not "assum[e], without deciding, this preliminary issue."). The Supreme Court noted that this preferred mode of analysis, while contradicting "the generally sound rule of avoiding determination of constitutional issues," is still appropriate because, "if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more,

provides no clear standard, constitutional or non-constitutional." *Id.*

If the court determines that the plaintiff has not alleged a deprivation of a constitutional right, then inquiry is over, for it would follow perforce that such right was not clearly established. However, if the court determines that the plaintiff has, in fact, alleged a deprivation of a constitutional right, then further inquiry is needed as to whether that right was clearly established at the time of the defendants' alleged violation of the right; and, of course, the violation of the clearly established right must be self-evident from the factual allegations set forth by the plaintiff in her complaint. *Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir.1988).

In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right." *Lowe v. Aldridge,* 958 F.2d 1565, 1570 (11th Cir.1992) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law, the unlawfulness must be apparent." *Id.* In determining the state of the law, this court must look to "the law originating in [the Eleventh] Circuit, as well as the Supreme Court, the courts of appeals, and the district courts." *Leeks v. Cunningham,* 997 F.2d 1330, 1333 (11th Cir.1993); *Greason,* 891 F.2d at 833. Therefore, for the plaintiff to defeat the defendants' request for dismissal on qualified immunity grounds, she must show that the right she is claiming was "clear, factually-defined, [and] well-recognized" at the time of the defendants' conduct. *Dartland,* 866 F.2d at

1321; *see also Bates v. Hunt*, 3 F.3d 374, 379 (11th Cir.1993).

The plaintiff, as representative of Haggard's estate, claims that the officers unreasonably used deadly force in their encounter with Haggard, in violation of the fourth and fourteenth amendments. There seems to be no question that these officers were acting in the scope of their discretionary authority at the time of the alleged constitutional deprivation. To resolve the qualified-immunity question, therefore, a determination as to whether this incident implicates a clearly established constitutional right must be made. As to the fourth-amendment claim, the court finds that the right, if any, is not clearly established as to a pretrial detainee. On the fourteenth-amendment claim, the court finds that the plaintiff has not produced sufficient evidence to create a jury question as to the excessive use of force, and, in any event, that the officers are entitled to qualified immunity for their use of force under the facts of this case.

### 2. Fourth–Amendment Excessive–Force Claim

■ The correctional officers argue that the fourth amendment does not provide any protection to pre-trial detainees; rather, the fourteenth amendment is the proper source of constitutional protection. Both parties admit that the scope of fourth-amendment protection for pretrial detainees is not well-defined, citing *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989), in which the Supreme Court admitted that the point beyond arrest when fourth-amendment protection ends is unclear. *See also Vineyard v. County of Murray, Georgia*, 990 F.2d 1207, 1211 (11th Cir.1993). This court sees no need to delve into this uncertain corner of the law at this time. Without clearly established law to guide the officer's actions, qualified immunity applies. Summary

judgment is due on the fourth-amendment excessive-force claim against the officers.

### 3. Fourteenth–Amendment Excessive–Force Claim

■ The fourteenth amendment clearly provides due-process protections to pretrial detainees against the use of excessive force that amounts to punishment. *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10; *Vineyard*, 990 F.2d at 1211. In assessing the actions of the officer vis-a-vis substantive due-process requirements, the Eleventh Circuit has adopted the analysis set forth in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1500–01 (11th Cir.1985) (en banc), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). The exigencies and practicalities of detention force the conclusion that not every application of intentional force rises to the level of a deprivation of due process. *Johnson*, 481 F.2d at 1033. Therefore, the *Johnson* court identified several relevant concerns in determining whether the constitutional line has been crossed: the need for the use of force, the relationship between the need for force and the amount of force used, the extent of injury inflicted, and the motive for using force, whether force was in good faith to restore order or maliciously for the purpose of causing harm. *Id.* at 1033.

■ Viewing the evidence presented in the light most favorable to the non-movant, the court finds that the plaintiff has not raised a substantial question of material fact as to whether the force used against Haggard contravened due-process protections. Some level of force was necessarily used by the officers to restore order to a disruptive situation, and this level of force may indeed have been higher than usual due to the characteristics of the situation.

Haggard was wet and slippery, as was the floor of his cell, from the flooded commode. The officers therefore had great difficulty holding on to Haggard and subduing him. Haggard was also apparently undergoing a mental breakdown, which made reason and discussion a less effective way to control the situation. Although the neighboring inmates heard the officers threaten to "kick [Haggard's] ass," this statement, like so many others used by law enforcement to attempt to defuse a situation before the actual use of force is imminent, is not of itself indicative of bad faith or malice on the part of the officers. While neighboring inmates heard sounds of a scuffle, including the sound of slaps or punches, this force may well have been necessary in the performance of the officers' duties. In short, the facts as presented do not sufficiently raise a jury question that the officers used excessive force: That some force was necessary is evident, and the exigencies of the situation and the lack of first-hand clear testimony from the inmates as to the events within the cell make it impossible for a jury to reject the correctional officers' first-hand account without doing any more than guessing as to what occurred.

In addition, in order to hurdle the qualified immunity defense, the breached constitutional standard must be one that was clearly defined at the time of the incident. It is clearly established, as cited above, that to inflict harm in bad faith on a pretrial detainee as punishment is in violation of the due process clause of the fourteenth amendment. *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10; *Vineyard,* 990 F.2d at 1211. Based on the foregoing discussion, there is not sufficient evidence to overcome qualified immunity for the officers on this claim: it has not been established that the conduct of the officers would contravene a clearly defined constitutional standard.

## B. Deliberate Indifference to Medical Needs (Count Two)

There are two distinct claims of deliberate indifference to the serious medical needs of Haggard. First, the failure of the officers to resuscitate Haggard after he stopped breathing is arguably a predicate for such action. Second, the nursing staff's denial of mental-health evaluation and treatment for Haggard could show deliberate indifference.

### 1. Eighth–Amendment Deliberate–Indifference Claim

 The eighth amendment's protection against cruel and unusual punishments is violated by deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Although the plaintiff attempts to characterize this set of claims as violative of the eighth amendment, it is well settled that the guarantees of that amendment are not available to pretrial detainees. *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977); *Tittle v. Jefferson County Com'n,* 10 F.3d 1535, 1539 n. 3 (11th Cir.1994). The provisions of the eighth amendment are relevant as a limitation of the state's power to punish, a power that the state possesses only after a formal adjudication of guilt against the accused. *Ingraham,* 430 U.S. at 671–672 n. 40, 97 S.Ct. at 1412–13 n. 40.

Rather, the relevant constitutional guideline for pretrial detainees is the due process clause of the fourteenth amendment. As no constitutional violation under the eighth amendment may be found against the defendants in this case, claims arising under the eighth amendment shall be dismissed.

### 2. Fourteenth–Amendment Deliberate–Indifference Claim

■■■ The Supreme Court has held that the protection afforded a pretrial detainee by the fourteenth amendment is "at least as great" as the protection under the eighth amendment granted to a prisoner. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Therefore, at a minimum, the deliberate indifference of officials to the serious medical needs of a pretrial detainee will violate the fourteenth amendment. *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419 (11th Cir.1997) The argument that a lesser standard should be used to evaluate the conduct of the officers under the fourteenth amendment is eminently logical. While the eighth amendment guarantee for prisoners prohibits only *cruel and unusual* punishment, the due process protection for pretrial detainees is to prohibit the imposition of *any* condition of confinement that amounts to punishment, *Bell v. Wolfish*, 441 U.S. 520, 537 n. 16, 99 S.Ct. 1861, 1873 n. 16, 60 L.Ed.2d 447 (1979).

■■■ However, in the context of a claim implicating the denial of a basic need of a pretrial detainee, such as food, water, or medical care, the Eleventh Circuit has treated the eighth- and fourteenth-amendment protections as coextensive. *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir.1985);[32] *see also Tittle v. Jefferson County Commission*, 10 F.3d 1535, 1539 (11th Cir.1994) (prisoner suicide). Therefore, to prevail on a charge that jail officials failed to provide adequate medical treatment, a pretrial detainee must show that the officials acted with deliberate in-

difference to the detainee's serious medical condition. *Tittle*, 10 F.3d at 1539; *Thornton v. City of Montgomery*, 78 F.Supp.2d 1218, 1225 (M.D.Ala.1999), *aff'd*, 228 F.3d 414, 415 (11th Cir.2000) (table).

■■■ "Deliberate indifference" requires that the official know of and disregard an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). The official "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (emphasis added). Deliberate indifference contemplates a state of mind more blameworthy than negligence. *Id.* at 835, 114 S.Ct. at 1978. A "serious medical condition" is an objectively serious medical need that, if left unattended, poses a serious risk of serious harm. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal citations omitted).

### a. Claim Against Nurses

■■■ Psychiatric needs can constitute serious medical needs, and severe inattention to these needs can constitute deliberate indifference. *Greason v. Kemp*, 891 F.2d 829, 834 n. 10 (11th Cir.1990). However, the bare claim asserted by the plaintiff is that the nurses, without knowledge of any sort of Haggard's serious mental problem, were deliberately indifferent by failing to obtain and review the relevant medical records and, consequently, by failing to obtain treatment and medication upon learning that Haggard, an apparently normal acting and looking young man, had been evaluated for mental-health problems

---

**32.** The *Hamm* court reached this result because it perceived the danger in forcing courts and prisons to evaluate slight differences in the allowable conditions imposed upon pretrial detainees and regular inmates, as most modern jails house both groups. 774

F.2d at 1574. With regard to the basic needs of either group, "[l]ife and health are just as precious to convicted persons as to pretrial detainees," and the protections and analysis of the eighth amendment are sufficient. *Id.*

in the past and had been prescribed medication for rest.

■ Given the limited amount of information provided to the nurses by Haggard during intake, these failures do not exhibit knowledge of a serious risk and the conscious disregard of the risk with knowledge of the probable harm that would result, so as to evidence a constitutional violation. *Cf. Campbell v. Sikes*, 169 F.3d 1353 (11th Cir.1999) (holding that defendant psychiatrist, who discontinued inmate's psychotropic medication based on summary of inmate's prior mental health treatment was not deliberately indifferent); *Dolihite v. Maughon*, 74 F.3d 1027, 1043 (11th Cir.1996) (holding that therapist with knowledge of inmate's mental illness who took inmate off medication and observation could be deliberately indifferent). There was no consciousness that the conduct was likely to cause harm: the nurses had no knowledge during intake, beyond a slight flag of past evaluations for mental illness and "rest" medication, to indicate that Haggard had any sort of mental problem. The failure to inform the officers or supervisors of Haggard's mental condition therefore also does not state a constitutional-level deprivation by the nurses. Nor does the failure to provide mental-health treatment during Haggard's time at the Montgomery County Detention Facility state a claim against the nurses.

b. Claim Against Correctional Officers

The plaintiff claims that the correctional officers were deliberately indifferent to the serious medical needs of Haggard by failing to resuscitate him after they realized he was not breathing. The plaintiff contends that the officers knew Haggard was in this state before they left the cell or, at the latest, by the time they were on the catwalk. The court finds competent evidence to suggest that the officers knew

Haggard was unconscious and not breathing when they took him from the cell. For example, many of the inmates have given testimony that they heard sounds of choking from inside the cell during the altercation and that Haggard looked unconscious or dead when removed from the cell. The officers seemed panicked, and Officer Orum is reported to have repeatedly said "damn, damn, damn." Moreover, once the officers knew that they had applied force sufficient to render Haggard unconscious, they were obligated to make sure that that force had not left him lifeless too.

■ It is well-established that failing to provide needed assistance in response to the serious medical condition of a prisoner arises to the level of a constitutional violation. *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir.1997) ("The case law also had clearly established before this case arose that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."). Failing to resuscitate or immediately call medical personnel in response to a unconscious, non-breathing prisoner clearly violates this standard. It follows that summary judgment is not appropriate for the claim of deliberate indifference to serious medical needs as to the officers involved.

C. Failure to Train and Supervise (Count Three)

■ Supervisory personnel cannot be liable under § 1983 for a constitutional violation of one of their subordinates via a theory of respondeat superior. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir.1990). Rather, to hold supervisors lia-

ble, the plaintiff must be able to show either (1) that the supervisors personally participated in, instigated, or adopted the acts comprising the alleged constitutional violation or (2) that there was a "causal connection" that links the supervisors' policies or decisions and the constitutional violation. *Hill v. Dekalb Reg'l Youth Detention Ctr.,* 40 F.3d 1176, 1192 (11th Cir. 1994). A "causal connection" can be shown when there is a history of widespread abuse that should put the supervisor on notice of the problem, and the supervisor nevertheless fails to correct the problem. *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999). Such a connection could also be shown when an improper custom or policy established by the supervisor results in deliberate indifference to constitutional rights. *Id.,* citing *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991).

It is not alleged that any of the supervisors actually participated in or ratified the unconstitutional conduct. Nor is there evidence of a widespread problem of constitutional-level abuses occurring at the Montgomery County Detention Facility. Therefore, the court is looking for evidence that these supervisors developed policies that evidenced a deliberate indifference to inevitable violations of constitutional rights.

The court finds it expeditious to discuss all of the arguments made by Haggard as to the supervisory liability of various defendants under this count rather than under the substantive counts discussed above. Based on this court's sifting of the complaint and the relevant briefs, Haggard has raised basically four failures of supervisory personnel that allegedly arise to the level of constitutional violations, compensable under § 1983:(1) the lack of a policy requiring the nurses to follow up on any indication of mental illness in the screening report, for example, by requesting the

prior medical records of the detainee, (2) the lack of a policy to have anyone on staff or on call trained in the recognition, care, or treatment of mentally ill inmates, (3) the lack of a policy distinguishing between mentally ill or suicidal inmates and regular inmates in the use of force or extraction techniques, (4) a general lack of training on the proper use of force.

As to the first alleged policy deficiency, the Montgomery County Detention Facility did have a policy designed to help officers recognize "special handling" issues, including mental illness, for inmates during the intake process. Nurses were also required by policy to screen new inmates, including asking whether they had been treated for mental health problems and whether they had attempted suicide. This policy also required nurses to determine independently, based on their observations of the inmate, whether the inmate appeared suicidal. When an inmate requests treatment or appears unstable, during intake or otherwise during his incarceration, it is the policy and practice of the nursing staff to recommend mental health evaluations.

 It is undisputed that there were no incidents involving Haggard that should have triggered a knowledge on the part of jail officials as to Haggard's mental illness before his breakdown on October 11. The question presented, then, really is whether the lack of a requirement to follow-up for inmates who only acknowledge past mental-health problems or evaluations for mental-health problems indicates a constitutionally deficient policy. What the plaintiff truly asserts is that there must be a policy of obtaining the medical records of any inmate that winds up at the Montgomery County Detention Facility, and this court finds that the lack of such a policy is not enough for supervisory liability under § 1983. *Starcher v. Correctional Medical*

*Systems, Inc.*, 7 Fed.Appx. 459, 466 (6th Cir.2001); *Wood v. Housewright*, 900 F.2d 1332 (9th Cir.1990).

■ The plaintiff also contends that the failure of the Montgomery County Detention Facility to have a mental health professional on call or on staff amounts to a constitutionally defective policy. Of course, municipal jails are not required to provide on-site psychiatric care for their inmates. *Young v. City of Augusta, Georgia*, 59 F.3d 1160, 1171 (11th Cir.1995). However, if it is proved that a policy of deficiencies in staffing or procedures results in an inmate effectively being denied necessary medical care, liability may attach. *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir.1988). As outlined above, the detention facility did have in place a number of policies that attempted to identify suicidal or mentally ill inmates during intake and to properly provide for their safe incarceration. In addition, it was the practice of the detention facility to refer to a mental-health professional inmates who appear to be mentally unstable or who request treatment. These policies and practices do not reveal the sharp denial of mental-health treatment that the plaintiff in this case tries to make out.

■ The Supreme Court has held that there is no obvious need to train police officers in diagnosing or treating mental illness. *City of Canton v. Harris*, 489 U.S. 378, 396–97, 109 S.Ct. 1197, 1209, 103 L.Ed.2d 412 (1989); *Young*, 59 F.3d at 1171–72. This axiom is easily extended to the third contention of the plaintiff, focusing on a failure to train the officers to distinguish mentally ill inmates in order to apply a different type or procedure for the use of force or for cell extraction. The lack of training in this area is not sufficient for supervisor liability under § 1983.

■ As to the fourth policy, there is an obvious need to train officers in the proper use of deadly force. The question of whether deadly force is appropriate is an example of a recurrent situation that jailers, in particular, are likely to face, and a situation in which a lack of training can obviously lead to the denial of constitutional rights. *City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10. However, it is apparent that the detention facility has developed and employs sufficient standards on this issue to meet the constitutional requirements. These policies included warnings on the dangers of positional asphyxia. The supervisors should not be held liable, though policies were in place, for the individual wrongdoing of its employees in contravention of those standards. There has been no evidence presented that the misuse of force is an endemic problem at the detention facility, and therefore the court cannot conclude that the fact that the detention facility's policies were not being followed by its officers was brought to the attention of the supervisory staff.

Therefore, there is no basis on which the claims against the supervisory personnel should proceed to trial.

**D. Medical Malpractice (Count Four)**

The complaint alleges that Nurse McElroy and Baptist Health Center violated the Alabama Medical Liability Act by "fail[ing] to make further inquiry, investigation, analysis, and/or effort to discover and/or determine the details of Haggard's mental illness," and "fail[ing] to treat and/or request treatment and/or evaluation of Mario Haggard for the mental illness." Third Amended Complaint, ¶ 46. Baptist Health is further alleged to have violated the statute by failing to train and supervise McElroy with respect to the treatment of mentally ill patients and the proper medical screening of inmates at the detention facility. *Id.* ¶ 47. Therefore, the crux of the state-law claim against these defendants is the failure to properly screen and treat

Haggard for mental illness. According to the plaintiff, these failures proximately caused Haggard's psychological episode, injury, and death on October 11, 2001.

■ A plaintiff under the Alabama Medical Liability Act must ordinarily present expert testimony from a similarly situated health provider to illustrate (1) the appropriate standard of care, (2) a deviation in this case from that standard of care, and (3) that the deviation proximately caused the injury in this case. *Lyons v. Walker Regional Med. Ctr.*, 791 So.2d 937, 942 (Ala.2000). The appropriate standard of care turns on the existence of a provider-patient relationship; without this relationship, there is no breach of standard of care that can support liability under the statute. *Wilson v. Teng*, 786 So.2d 485, 498–99 (Ala.2000).

McElroy and Baptist Health contend that the medical claim is barred by the statute of limitations and that, in any event, the plaintiff has failed to present substantial evidence to make out the claim.

### 1. Statute of Limitations

The statute of limitations for a cause of action under the Alabama Medical Liability Act is two years. Ala.Code 1975 § 6–5–482(a). This period runs from "the act, or omission, or failure giving rise to the claim." *Id.* However, if the cause of action could not be discovered within two years from the act or omission, the statute allows the claim to be filed within six months of discovery. Ala.Code 1975 § 6–5–482(a). *Id.*

■ The statute of limitations begins to run when the first injury or harm occurs, although the injury may later become more severe or different in kind. *Free v. Granger*, 887 F.2d 1552 (11th Cir.1989) (finding that cause of action accrued when patient first had infection, not when treated by the doctor); *Ramey v. Guyton*, 394 So.2d 2, 4 (Ala.1980) (finding that cause of

action accrued when patient had stroke, not when doctor last saw patient and prescribed medicine). The harm in this case occurred on October 11, 1999, the day on which Haggard had a mental breakdown and died as a result of asphyxiation. As the claim under the Alabama Medical Liability Act was filed against these defendants on September 13, 2001, the two-year statute of limitations is not a bar.

### 2. Failure to Present Expert Testimony

However, expert testimony is generally necessary in a claim under the Alabama Medical Liability Act, as the particular standard of care and its breach must be identified by one with knowledge of the area. *Lyons*, 791 So.2d at 942. While the plaintiff presents evidence that the conduct of Nurse McElroy may have breached protocols of the Montgomery County Detention Facility, no evidence has been presented that the conduct breaches general standards of medical care. It is clear that the testimony cited by the plaintiff is illustrative of what the nurses considered their duties and responsibilities to be at the detention facility, not their opinion as to the required nurse standard of care under the Alabama Medical Liability Act. The court declines to extend their testimony so far as to support this claim against McElroy. For substantially similar reasons, the claim against Baptist Health must also fail.

## V. CONCLUSION

It does appear that the ultimate source of the unfortunate outcome in this case was the lack of proper mental-health treatment given to Haggard while detained at the Montgomery County Detention Facility. A significant percentage of inmates, 15 to 20 % according to several studies, suffer from mental illness when incarcerated. *See, e.g.,* Justice Resource and Statistics Association, Crime and Justice Atlas 2000,

15–16 (available online at http://www.jrsa.org/programs/crimeatlas. html). In light of these statistics as well as the general nature of mental illness, in that those most afflicted are unable to articulate the nature of their affliction, and, in this case, in light of the inmate being a juvenile, of less than full maturity and correspondingly of even less ability to articulate or understand his condition, it is reasonable to conclude that it is a grave and unfortunate lapse for a detention facility not to have a dedicated mental-health professional involved in screening new inmates or detainees and routinely checking, for all inmates, to see if there are past mental-health records available. However, according to binding law, this lapse does not amount to a constitutional deprivation; redress lies not with the courts but rather with the detention facilities themselves and those responsible for the facilities.

For the foregoing reasons, it is ORDERED as follows:

(1) The motions for summary judgment filed by all defendants on July 27, October 10 and 12, and November 2 and 5, 2001 (Doc. nos. 50, 93, 99, 115, & 116), and January 7, 2002 (Doc. no. 143), are granted as to all claims and all defendants except the plaintiff's deliberate-indifference-to-serious-medical-needs claim against defendant correctional officers Silas Orum, III, James Thrift, Darryl N. Wood, Jeffrey Sanderson, and Clarence Wilson, as asserted under the fourteenth amendment.

(2) Judgment is entered in favor of all defendants and against plaintiff on all claims except the fourteenth-amendment deliberate-indifference-to-serious-medical-needs claim against defendant correctional officers Orum, Thrift, Wood, Sanderson, and Wilson.

(3) This case will proceed to trial on only the plaintiff's fourteenth-amendment deliber ate-indifference-to-serious-medical-

needs claim against defendant correctional officers Orum, Thrift, Wood, Sanderson, and Wilson.