Willie G. HARRIS, Plaintiff–Appellee,

v.

COWETA COUNTY, a Political Subdivision of the State of Georgia, Larry T. Hammett, Sheriff of Coweta Co., Defendants–Appellants.

No. 92–8549.

United States Court of Appeals, Eleventh Circuit.

May 23, 1994.

H. Lane Young, Kimberly A. Houston, Freeman & Hawkins, Atlanta, GA, for appellants.

James A. Eidson, Eidson & Associates, Hapeville, GA, for appellee.

ON PETITION FOR REHEARING AND SUGGESTION OF REHEARING EN BANC

Before BLACK and CARNES, Circuit Judges, and RONEY, Senior Circuit Judge.

BLACK, Circuit Judge:

As no member of this panel, nor any other judge in regular active service on this Court, has requested that this Court be polled on rehearing en banc, the suggestion of rehearing en banc is DENIED. Fed.R.App.P. 35; 11th Cir.R. 35–5. The original panel, however, hereby grants rehearing, withdraws the previous panel opinion dated October 27, 1993, published at 5 F.3d 507 (11th Cir.1993), and substitutes therefor the following opinion:

Plaintiff–Appellee Willie G. Harris, a Georgia inmate serving a life sentence for armed robbery, brought this § 1983 action alleging denial of proper medical treatment for a hand injury during his pre-conviction incarceration from September 1990 through January 1991 at the Coweta County jail. Harris sued Coweta County and county Sheriff Larry T. Hammett in his individual and official capacities, asserting an Eighth Amendment claim of deliberate indifference to his medical needs, Fifth and Fourteenth Amendment violations of due process, parallel Georgia constitutional claims, and negligence per se. All parties moved for summary judgment, and Sheriff Hammett claimed entitlement to qualified immunity.

The district court's order in relevant part denied the Sheriff's motion for summary judgment based on qualified immunity.[1] The

---

1. Denial of a public official's motion for summary judgment on the grounds of qualified immunity is an appealable interlocutory order. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). We decline to exercise our discretionary pendent jurisdiction over the County's and Sheriff's official capacity appeals from the district court's order, *see, e.g.,*

court ruled that the prohibition against cruel and unusual punishment was "undoubtedly clearly established"; that "a reasonable county sheriff would have known in 1990 that denial of or interference with a prisoner's or a pre-trial detainee's medical care could, in appropriate circumstances, constitute a [constitutional] violation"; and that there was a genuine issue of material fact whether Sheriff Hammett's actions were egregious enough to amount to deliberate indifference.

The question presented on appeal is whether Sheriff Hammett, in his individual capacity, is entitled to qualified immunity from trial and personal liability for damages. We hold that Sheriff Hammett has lost his entitlement to qualified immunity and affirm the district court's order. A ruling denying qualified immunity does not render the Sheriff liable for deliberate indifference, however; the jury will determine whether the Sheriff was or was not deliberately indifferent to Harris' medical needs.

## I.

Harris entered the Coweta County jail on September 6, 1990. He remained there, with the exception of a few days, until his conviction for armed robbery on January 25, 1991, after which he was transferred to the state prison system. While Harris was in the Coweta County jail, three fingers of his left hand became curled up and he was unable to open them. The fingernails grew toward and into his palm. A nerve conduction diagnostic test and possible surgery were recommended by the county jail doctor and consulting physicians. Harris contends that Sheriff Hammett deliberately delayed the prescribed diagnostic test and surgery while he was incarcerated in the county jail in order to transfer him to the state system for the surgery.

## A.

■ Government officials performing discretionary functions are shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitz-*

gerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity protects public officials from broad-ranging discovery disruptive to effective government, *id.* at 818, 102 S.Ct. at 2738, and operates as a shield against civil damages due to mistaken judgments, *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986); *see also Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978) ("[Public] officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law."). The qualified immunity entitlement will fail only "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2737 (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)) (emphasis removed).

## B.

■ Sheriff Hammett retains his entitlement to qualified immunity if a reasonable sheriff, in light of the information known to Sheriff Hammett and pre-existing law, could have believed his conduct lawful. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). The answer to this question depends on whether the law allegedly violated was clearly established at the time of the complained-about conduct, and, if it was, whether the official's conduct was objectively reasonable in light of the information known to the official at the time. These are objective, albeit fact-specific, inquiries, *id.* at 641, 107 S.Ct. at 3040, which we undertake as questions of law, *Mitchell v. Forsyth,* 472 U.S. 511, 526–28 & n. 9, 105 S.Ct. 2806, 2815–16 & n. 9, 86 L.Ed.2d 411 (1985). We review the record through the eyes of an objective, reasonable governmental official. *Nicholson v. Georgia Dep't of Human Resources,* 918 F.2d 145, 147 (11th Cir.1990). To determine whether Sheriff Hammett's actions were objectively reasonable, we look at the information known to him, viewed in a light most favorable to

*Schmelz v. Monroe County,* 954 F.2d 1540, 1543     (11th Cir.1992), and dismiss those appeals.

the plaintiff. *Swint v. City of Wadley,* 5 F.3d 1435, 1438 (11th Cir.1993), *modified on reh'g on other grounds,* 11 F.3d 1030 (11th Cir.1994).

We emphasize that the qualified immunity determination is before us on summary judgment and that the facts before us are "the facts" known at this stage of the proceedings. *Id.* at 1439. Moreover, the qualified immunity determination does not dictate liability on the Sheriff's part. With these caveats in mind, we turn to what the record shows Sheriff Hammett knew during the time Harris was in the Coweta County jail and to the legal norms that existed at that time.

## II.

Although Harris alleges that Sheriff Hammett was deliberately indifferent to his medical needs the entire time he was in the Coweta County jail, there is no evidence in the record before us that the Sheriff personally had any knowledge of Harris' situation prior to the end of November.[2] On November 29, 1990, Harris was seen by Dr. Arrowsmith, an orthopedic physician. Dr. Arrowsmith's typed report to Sheriff Hammett stated that Harris:

> develope[d] severe contractures, and the salvage ability [sic] of this hand is markedly in question. It is very unfortunate that his treatment has been delayed this long, but certainly further delay must be avoided at all cost. I personally called the Sheriff's Office and explained that he needs immediate medical attention. I feel that this will most likely take the form of an EMG [electromyogram] to evaluate the functional status of his ulnar nerve down its length, most likely to be followed by surgical decompression of the nerve and then aggressive and vigorous rehabilitation of his finger contractures. This is apparently going to be done within the State Medical care system....[3]

On the bottom of this report were two notes by the jail's nurse, Ms. Gaddy: "Captain B. Adcock [the jail administrator] stated he would contact the judge for bond and handle things from that end next week. 11–30–90 B. Adcock spoke with R. Henry [the chief deputy] regarding above. This matter turned over to administration."

In early December, the Sheriff took steps to have Harris transferred to the state system. Harris was classified as a violent inmate while he was in the Coweta County jail because he was charged with armed robbery. Captain Adcock contacted the parole board to learn when Harris' parole would be revoked so that he could be transferred to the state system. Georgia requires a bond hearing in order for parole to be revoked for a

---

**2.** We include the following information only for the sake of clarity. On September 9, 1990, Harris filed his first request for medical attention to his hand, saying he thought he had a cracked bone. Nurse Gaddy, the jail's nurse, saw Harris on September 28. Sometime shortly after October 3, Dr. Warren, the physician on contract to the jail, examined Harris and found that he had "questionable paresthesia" in his left hand. Dr. Warren recommended that, if the symptoms continued, Harris should see a neurologist for a nerve conduction study to determine whether the nerve was operating properly. Throughout October, Harris submitted numerous requests for medical attention due to headaches, severe chest pains, and abdominal pains. He repeatedly saw Dr. Warren and, on October 13, Harris was taken to Humana Hospital to be examined for abdominal pains. Otherwise, he was given pain medication throughout this time. He made no additional requests for medical attention to his hand during October, and nothing else regarding his hand occurred during October. During early and mid-November, Harris was transferred to the Haralson County jail due to a housing short-

age at the Coweta County jail, back to Coweta County for a bond hearing, back to Haralson County, and back finally to Coweta County. There, on November 22, he filed a request for medical attention to his hand, migraine headaches, and severe chest pains. On November 23, he was taken to Humana Hospital, after which the transporting officer wrote a note to Nurse Gaddy stating that, "Willie's hand looks like it needs some attention. His 3 fingers are closed and his fingernails are growing into his palm."

Other record evidence, including but not limited to phone calls by Harris' mother, a "stern" January call by Dr. Arrowsmith, and the judge's direction at Harris' first bond hearing that Harris receive medical care for his hand, is not included in our determination of whether Sheriff Hammett retains his entitlement to qualified immunity because there is no record evidence at this stage that he actually knew of these events.

**3.** Dr. Arrowsmith had been told by someone in the Sheriff's Office that the surgery would be done within the state system.

parolee charged with armed robbery, but the judge had refused to set bond at Harris' first bond hearing. The parole board had agreed to take Harris into the state system if there was a bond, however, so Sheriff Hammett arranged a second bond hearing, informing the judge that there was an inmate who may have a medical problem that would be more appropriately treated in the state system.[4] On December 6, Harris' second bond hearing resulted in bond set at $100,000, an amount which Harris could not pay. The record as it stands before this Court is devoid of any further attempts by the Sheriff to have Harris transferred or the nerve conduction study performed during the rest of December.

On January 8, 1991, Harris saw Dr. Gorman, the new doctor under contract to the jail.[5] Dr. Gorman found Harris' fingernails gouging into his palm and his hand swollen and malodorous. He referred Harris to Dr. Hassett at the Papp Clinic in Newnan, Georgia, for a nerve conduction study, which was conducted the 16th of January. Dr. Hassett's report recommended improved hygiene, enforced exercise of the fingers, and ulnar transposition. The next day, January 17, Harris again saw Dr. Gorman, who observed that Harris "needs surgery ... as soon as possible.... Recommend soonest possible date...." Nurse Gaddy's notation on the bottom of Dr. Gorman's report stated: "Copy to L. Hammett—state to hold until he could contact state to set surg[ery] up—as soon as possible. Also, if this can't be done—*will* have Dr. Gorman set up surg[ery]."

Harris filed the underlying complaint on January 18. On January 21, Dr. Gorman referred Harris to Dr. Ballentyne, a Papp Clinic surgeon, for surgery "this week if possible on initial appointment." The next day Harris saw Dr. Ballentyne, who reported that Harris needed surgery but recommended that it be done at the state medical facility. Nurse Gaddy's notations on the bottom of Dr. Ballentyne's report show on January 22, "L. Hammett notif[ied] [read this statement] stated he would get this set up per Dr. Ballentyne's order; as soon as possible"; and on January 23, "Hammett stated he talked [with] Dr. Gorman regarding surg[ery]. Dr. Gorman stated surg[ery] was needed but not necessary immediately and could wait a few weeks."

Following Sheriff Hammett and Dr. Gorman's discussion on the 23d of January about Harris' surgery, the Sheriff directed Nurse Gaddy to request a written note from Dr. Gorman confirming their conversation by explaining that surgery was not needed immediately and that a few weeks would not make a difference. The note was also to include what doctor Harris should see, and when, if Harris was not transferred to the state system. Dr. Gorman's follow-up letter to Sheriff Hammett, dated January 23, 1991, stated that: "I have recommended that [Harris] have further evaluation for surgical correction ... the surgery needs to be done as soon as practical and preferably sooner than later ... [it] need not be done on an emergency basis and a delay of 1–2 weeks will not drastically affect his recovery...."

During Harris' trial on January 24, the Sheriff gave a copy of Dr. Gorman's letter to the judge in response to Harris' motion to continue the trial due to his medical needs. After his conviction and sentence on the 25th of January, Harris was treated again by Dr. Gorman on January 29. He was transferred to the state prison system on January 30, where his surgery took place March 11, 1991.

In summary, the record evidence shows that the Sheriff knew from the end of November that Harris had a serious medical condition but that it was not an emergency situation. Sheriff Hammett knew that a nerve conduction study was recommended by Dr. Arrowsmith on November 29, 1990, and on January 8, 1991, by Dr. Gorman. The nerve conduction study took place on January 16, 1991. Surgery was mentioned by Dr.

---

4. Sheriff Hammett believed that state prison facilities were better equipped to perform surgery on violent inmates. The Sheriff also believed that the state system was ultimately in charge of Harris, because he had a parole violation warrant outstanding.

5. Dr. Warren, the doctor who initially saw Harris, resigned the first of November. *See supra* note 2. Dr. Gorman was hired by the county mid-December, 1990.

Arrowsmith as a likely course of treatment on November 29, 1990, and was specifically recommended on January 21, 1991, by Dr. Gorman. Dr. Ballentyne concurred in the recommendation on January 22. Upon the Sheriff's inquiry in January, both Dr. Gorman and Dr. Ballentyne agreed that a short delay would not affect Harris' prognosis for recovery. Sheriff Hammett's actions during this time were directed at transferring Harris to the state system.

Given the information known to Sheriff Hammett as reflected in the summary judgment record before us, we turn to whether legal norms governing the Sheriff's actions were clearly established.

### III.

█ For purposes of qualified immunity, a legal norm is clearly established when "the right the official is alleged to have violated [was] 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. The "very action in question" does not have to have been previously held unlawful, but the unlawfulness of the conduct must be apparent in light of pre-existing law. *Id.*

█ It is well settled that prison officials' deliberate indifference to prisoners' serious medical needs gives rise to a constitutional claim.[6] In *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), the Supreme Court held that deliberate indifference to serious medical needs is proscribed by the Eighth Amendment's prohibition against cruel and unusual punish-

ment. The Court cautioned, however, that only those claims which rose to the level of a constitutional tort would be permitted to proceed under § 1983. Accidents, mistakes, negligence, and medical malpractice are not "constitutional violation[s] merely because the victim is a prisoner." *Id.* at 106, 97 S.Ct. at 292. The contours of the legal norms on deliberate indifference to medical needs have been subsequently evolving, and the particularity that *Anderson* requires has been given force by many reported cases testing the boundaries and details of deliberate indifference, including the features that make intentional delay in access to and interference with prescribed medical care actionable.

### A.

█ At the time of Harris' incarceration, it was clearly established that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference. *E.g., Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir.1989). Delay in treatment of serious and painful injuries was also clearly recognized as rising to the level of a constitutional claim.[7] *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.), *cert. denied*, 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir.1988). For purposes of qualified immunity, however, the pre-existing law must give officials some sense of what amount of time constitutes actionable delay in order for the law to be established with the particularity required by *Anderson*. We conclude that the legal norms did so.

### B.

█ The tolerable length of delay in providing medical attention depends on the na-

---

6. The record reveals some uncertainty about Harris' status as a detainee. Whether Harris was a detainee or a prisoner does not affect our analysis. The Due Process Clause of the Fourteenth Amendment protects a pre-trial detainee, and the protection corresponds with that provided to prisoners by the Eighth Amendment. *E.g., Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir.1988); *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir.1986); *see also City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

7. Although our analysis must include an evaluation of whether there is evidence of a serious medical need, *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir.1989), whether Harris' medical needs were serious has neither been raised nor disputed. We therefore assume that Harris' medical needs were sufficiently serious to raise a deliberate indifference claim. For a listing of medical conditions that were and were not considered sufficiently serious to raise a constitutional claim, see *Brown v. Hughes*, 894 F.2d 1533, 1538 n. 4 (11th Cir.), *cert. denied*, 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990).

ture of the medical need and the reason for the delay. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference. *E.g., Brown,* 894 F.2d at 1533. Delayed treatment for injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are obvious serious medical needs, may also give rise to constitutional claims. *E.g., Carswell v. Bay County,* 854 F.2d 454 (11th Cir.1988). For these kinds of serious injuries, such as Harris', the law was clearly established that several weeks was too long to fail to properly respond to the medical need. *See Mandel,* 888 F.2d at 787–90; *Carswell,* 854 F.2d at 457; *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700 (11th Cir. 1985). The law was also clearly established that the right to medical care may include diagnostic tests known to be necessary, not just medicinal and surgical care. *E.g., H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1086 (11th Cir.1986) (confirming earlier case law that "failure to provide diagnostic care and medical treatment known to be necessary ... [or] delay of necessary treatment for non-medical reasons ... establishe[s] deliberate indifference sufficient to establish a constitutional violation"). Finally, it was clear that deliberate indifference could be inferred from an unexplained delay in treating a known or obvious serious medical condition. *Brown,* 894 F.2d at 1538.

The contours of unreasonable delay in providing treatment for serious medical needs were defined with enough particularity to allow a reasonable sheriff with Sheriff Hammett's information to understand whether his actions were lawful. Under the clearly established legal norms, a reasonable sheriff would have known that delaying prescribed treatment for a serious medical need for several weeks for a nonmedical reason may violate an inmate's constitutional rights.

The prominent unexplained delay from November 29, 1990, when a nerve conduction study was recommended by Dr. Arrowsmith, until January 16, 1991, when the study was finally performed, is objectively unreasonable given the pre-existing law and Sheriff Hammett's information. In our view, based on the record before us, even the proffered partial explanation—pursuit of a transfer to the state system because Harris was classified as a violent inmate—does not explain the Sheriff's lack of action once the bond was set at an amount Harris could not pay. Inaction in the face of a known serious medical need, a prescribed course of care, and the failure of an alternative course of action (the transfer to the state system), is not conduct that a sheriff could reasonably consider lawful. Accordingly, we agree with the district court that Harris has shown facts sufficient to overcome the Sheriff's entitlement to qualified immunity in his individual capacity.

IV.

A ruling denying qualified immunity does not render the Sheriff liable for deliberate indifference. It means only that the claims against the Sheriff may proceed to trial. When the qualified immunity entitlement is lost at the summary judgment stage, additional or different facts may be discovered or developed regarding the trial questions of liability and damages. *See Swint,* 5 F.3d at 1438–39. At trial, the facts regarding deliberate indifference may be further developed, *e.g., Howell v. Burden,* 12 F.3d 190, 192 n. 2 (11th Cir.1994), and the jury will determine whether the Sheriff was or was not deliberately indifferent to Harris' medical needs. In particular, the subjective component of deliberate indifference—whether the Sheriff had a sufficiently culpable state of mind so that his alleged wrongdoing amounted to punishment—is a question for the finder of fact that is not resolved through the objective reasonableness inquiry of qualified immunity. *See Wilson v. Seiter,* 501 U.S. 294, 298–305, 111 S.Ct. 2321, 2324–27, 115 L.Ed.2d 271 (1991).

For the foregoing reasons, the district court's order is

AFFIRMED.

RONEY, Senior Circuit Judge, concurring:

I concur in the decision that summary judgment on qualified immunity grounds was properly denied with the understanding that *first,* the law concerning medical treatment of prisoners was clearly established, *i.e.,* the

plaintiff can recover only if the defendant was deliberately indifferent to the plaintiff's medical needs, and *second,* there are issues of fact as to whether the Sheriff's conduct rose to the level of deliberate indifference required to establish liability. The need for medical treatment upon which to base the claim may be shown not only by the facts the Sheriff knew at the time he acted, but by facts that a reasonable Sheriff should have known, had he been other than deliberately indifferent to the prisoner's medical needs.