[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 04-11073

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 31, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-01368 CV-T-N

WILLIE H. BOZEMAN,
as legal representative of the Estate of
Mario Haggard, deceased,

Plaintiff-Appellee,

versus

SILAS ORUM, III,
JAMES THRIFT, Correctional officer,
DARRYL N. WOOD,
JEFFREY SANDERSON,
CLARENCE WILSON,

Defendants-Appellants,

LARRY HAVERLAND,
et al.,

Defendants.

_____

No. 04-11722

_____

D.C. Docket No. 00-01368-CV-T-N

WILLIE H. BOZEMAN, as legal representative of

the estate of Mario Haggard, deceased,

Plaintiff-Appellant,


versus

SILAS ORUM, III,
JAMES THRIFT,
DARRYL N. WOOD,
JEFFREY SANDERSON,
CLARENCE WILSON, et al.,

Defendants-Appellees,

LARRY HAVERLAND,
et al.,

Defendants.

_____

Appeals from the United States District Court
for the Middle District of Alabama

_____

**(August 31, 2005)**

Before EDMONDSON, Chief Judge, DUBINA and HULL, Circuit Judges.

PER CURIAM:

Mario Haggard was killed as a result of a struggle with correctional officers while a pretrial detainee at the Montgomery County Detention Facility ("MCDF") in Alabama. Through Haggard's guardian, Plaintiff Willie Bozeman, Haggard's estate brought this civil suit for money damages under 28 U.S.C. § 1983. The suit made claims against the correctional officers and alleged excessive force and deliberate indifference to serious medical needs. Plaintiff also brought claims

2

against MCDF supervisors and nurses. The district court denied qualified immunity to the Officers but granted summary judgment in favor of the supervisors and nurses. We affirm the district court's decisions.

## Standard of Review

On this interlocutory appeal we review de novo the district court's denial of summary judgment to the Officers. In doing so, we do not make credibility determinations or choose between conflicting testimony, but instead accept Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor.[1] See Evans v. Stephens, 407 F.3d 1272, 1277-78 (11th Cir. 2005) (en banc).

_____

[1] We agree with the district court that the following pieces of evidence cannot be reduced to admissible form at trial; so, we -- like the district court -- will not consider them in deciding this case: (1) the witness statements in the Alabama Bureau of Investigation reports are unsworn and thus fail to meet the affidavit requirements of Federal Rule of Civil Procedure 54(c); (2) the testimony of Dr. Lauridson on the time the Officers knew Haggard had stopped breathing is based entirely on hearsay; and (3) portions of inmate depositions are based on hearsay.

Defendants argued on appeal that the statement of Joe Lee Falls, made under oath in question-and-answer format and given before a court reporter, was inadmissible for summary judgment purposes because it was neither signed nor taken in the presence of Defendant's lawyers to allow cross-examination (the statement was taken before suit was filed). We reject this argument. Sworn statements given before court reporters are at least as reliable as signed affidavits and are properly considered on summary judgment. See 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §§ 2721, 2724 (3d ed. 1998 & Supp. 2005); see also In re Sunset Bay Assocs., 944 F.2d 1505, 1510 (9th Cir. 1991). Accordingly, we will consider Falls' statement -- together with his later deposition -- in discerning the facts for summary judgment.

## Background

For today's decision, we assume these facts.

Mario Haggard was a seventeen-year-old pretrial detainee held at MCDF. Haggard was transferred to MCDF in August 1999, following a successful escape attempt from the Mt. Meigs Youth Facility. A juvenile court had found "no reasonable grounds to believe [Haggard was] committable to an institution or agency for the mentally . . . ill" and found that Haggard "[could] not be properly disciplined under juvenile law."

Upon arrival at MCDF, Haggard was housed in cell block 4E, which was reserved for escape risks and other high-risk inmates. Between 4:15 and 4:45 a.m. on 11 October 1999, Officer Wilson called from the control booth to the MCDF booking area to report that, in 4E on the top tier, a problem existed with an inmate: Haggard. Officer Orum and Sergeant Gipson went to investigate and observed that Haggard had flooded his cell with toilet water, that urine and feces were on the floor, and that water was running from the top tier over the balcony to the first floor of the facility. Haggard was naked, pacing his cell, yelling religious phrases,[2] and drinking the water from the toilet and spitting the water toward the

---

[2]For example, "Jesus I am coming to see you" and "See the blood of Jesus on me."

4

Officers.  Sergeant Gipson (a female guard) returned to the booking area to allow Sergeant Thrift (a male guard) to come to Haggard's cell to assist Officer Orum.

Sergeant Thrift and Officer Orum tried to calm Haggard by talking to him. Haggard was unresponsive and continued his behavior.  Officers ordered the water supply in Haggard's cell to be cut off and directed trustees to begin cleaning up the water that had run out of Haggard's cell.

Haggard continued drinking the toilet water, vomited several times and, at some point, tied a string around his neck in an obviously futile attempt to hang himself.  By about 5:45 a.m., Officers Wood and Sanderson arrived at the cell. Some inmates testified that the Officers told Haggard that, if they had to come in the cell, they would "kick his ass" and Haggard would be "in for a rude awakening."

In what seems to have been an effort to relocate Haggard to a holding cell, four Officers -- Thrift, Orum, Sanderson and Wood -- entered Haggard's cell.[3] The Officers attempted to subdue Haggard on his bunk so that they could handcuff him.  When they put their hands on Haggard, the Officers had trouble holding onto him because Haggard was wet and had also applied grease to his body to make

---

[3]A fifth officer, Officer Wilson, arrived at Haggard's cell some time later; the exact time of Officer Wilson's arrival is unclear.

himself slippery.[4]  Haggard evaded all four Officers for some time, slipping to the floor, rolling from his stomach to his back, kicking, and positioning himself under the bed while holding onto one of the bed's legs.[5]  The Officers were also slipping and falling around the cell on the wet floor.

Several inmates testified that the cell block got quiet, after the Officers entered the cell, allowing the inmates to hear sounds of the scuffle.  Various inmates testified that they heard punching and slapping, what sounded like someone being slammed to the bed, and an officer say to Haggard, "Is that all you've got?"  Inmates also testified they heard choking sounds and what they thought was someone "gagging for air," followed by silence on Haggard's part.

Inmate Joe Lee Falls was a trustee who had been assigned to clean up the water outside Haggard's cell and could see inside the cell during part of the event.  Falls testified that Haggard was mad and continued to struggle with the officers, even after he had been shackled.  Falls said "[Haggard] wasn't giving up after they had him bound down," and "[Haggard] was handcuffed, and he was still trying -- you know, he was still trying to get up."

---

[4]Inmates are able to buy some kind of grease in MCDF, apparently as a hair product.  One inmate testified that inmates grease themselves in preparation to "do battle" with correctional officers because it makes an inmate difficult to hold.

[5]Haggard was 5' 10" and weighed about 200 lbs; Inmate Joe Lee Falls described him as "strong" and "stout."

Falls also testified that, during the struggle, the Officers had Haggard face-down on the bed, were applying weight to him, and that Officer Sanderson, at one time, was pushing down on Haggard's head. According to Falls, at some point in the struggle, the Officers asked Haggard if he had "had enough" and if he was "going to quit." Haggard replied, "Yeah, I give . . . I've had enough," to which the Officers responded "Oh, we don't think you've had enough." Falls observed that the officers continued to "lay on" Haggard. Falls said he then heard a "sound like . . . the wind went out [of Haggard]."

The time from when the Officers entered Haggard's cell until the time they left the cell carrying Haggard was about twenty minutes. Once Haggard was shackled, all five Officers participated in carrying Haggard out of his cell. The Officers had draped a blanket over Haggard because he was naked. Inmates testified that some of the Officers looked panicked; and one inmate heard Officer Orum repeatedly say, "damn, damn, damn."

Accounts among Plaintiff's witnesses vary about whether the Officers shackled Haggard while inside his cell or outside his cell on the catwalk and about whether the Officers carried Haggard in a face-down or face-up position.[6] All

---

[6]A video showing portions of the Officers' transporting of Haggard in the Jail corridors depicts four Officers carrying Haggard without batons -- one officer holding Haggard underneath each shoulder and one carrying each foot -- in a face-down position.

7

Plaintiff's witnesses, however, consistently testified that, from the time Haggard was carried from his cell, Haggard appeared to be lifeless. Inmates testified that Haggard made no movements or sounds while being carried and that his body hung and flopped in an uncontrolled manner. One inmate testified that, when the Officers set Haggard down in front of the inmate's cell for about a minute while trying to open a locked door, Haggard never moved and that Haggard's ankles were blue and swollen.

The Officers carried Haggard from his cell in 4E on the second level to take him to an isolation cell in a corridor located in 4 North, which was on the first level. While 4E had a set of stairs, the Officers elected to carry Haggard through a door connecting 4E and 4F to use the stairway in 4F. The 4F stairway was wider, less steep, and dry.[7] Plaintiff contends, and the videotape confirms, that it took about fourteen minutes for the Officers to transport Haggard from his cell to the 4 North corridor.

Once in 4 North, the Officers again set Haggard on the ground to wait for the isolation cell to be prepared; the Officers testified that, at this time, they noticed that Haggard appeared unconscious. The Officers then summoned Nurse

---

[7]Plaintiff contends the Officers took the longer route so that they would be seen by fewer inmates while carrying Haggard. But it is clear that inmates were present on the route taken by the Officers, and Plaintiff has pointed to no evidence comparing the number of inmates between the two routes.

Rainey who arrived on the scene about two minutes later and began life-saving techniques. Nurse Rainey later testified that, when she arrived, Haggard felt cold to the touch. Paramedics arrived shortly thereafter and transported Haggard to the hospital where resuscitation efforts ceased at 7:28 a.m.

An autopsy report rendered by Dr. James Lauridson concluded that asphyxia was the cause of death. Dr. Lauridson opined that Haggard's ability to breathe was constrained at some point during or throughout the struggle. According to the report, he saw no physical evidence of Haggard having received blows to the head, being struck or beaten with an object, or pressure having been applied to Haggard's back. Lauridson's later grand jury testimony, however, indicated that the abrasions on the inside upper and lower lips of Haggard were consistent with his head having been face-down on the bed at some time during the struggle thus impairing Haggard's ability to breathe.

Plaintiff brought constitutional claims against the five Officers for excessive force and for deliberate indifference to serious medical needs. The district court denied summary judgment to the Officers. Plaintiff also brought deliberate indifference claims against Nurses Boddie and McElroy,[8] and brought supervisory liability claims against Jail Supervisors Larry Haverland, Gina Savage, Wanda

---

[8]Nurse Rainey was voluntarily dismissed by Plaintiff.

9

Robinson, and Sheriff D.T. Marshall. The district court granted summary judgment for Defendants on the claims against the Sheriff, nurses, and supervisors.[9]

## Discussion

In this interlocutory appeal, we must decide whether the Officers in this case are entitled to qualified immunity, that is, whether they are immune from suit. Before doing so, we, however, first ask whether Haggard's constitutional rights were violated at all. If so, we then take up the question of whether that right was, on 11 October 1999, "already clearly established in such a particularized way to make obvious the conclusion for all reasonable, similarly situated jail officials that what Defendants were doing violated [Haggard]'s federal rights under the circumstances." Purcell v. Toombs County, Ga., 400 F.3d 1313, 1319 (11th Cir. 2005).

---

[9]Pursuant to a Rule 54(b) certification of final judgment from the district court, Plaintiff cross-appealed the district court's grant of summary judgment on the claims against the Sheriff, nurses, and supervisors. We affirm, without further discussion, the district court's judgment in favor of Sheriff Marshall, Supervisors Haverland, Savage, and Robinson, and Nurses Boddie and McElroy.

I. Excessive Force Claim

    A. Constitutional Violation.

Plaintiff argues that the Officers violated Haggard's Fourteenth Amendment rights by using excessive force while subduing Haggard in his cell causing him to suffocate. "Claims involving the mistreatment of . . . pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners." Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). But it makes no difference whether Haggard was a pretrial detainee or a convicted prisoner because "the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees." Id.

We thus apply the excessive force standard first enunciated in Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973), adopted by this Circuit in Williams v. Kelley, 624 F.2d 695, 697-98 (5th Cir. 1980),[10] and applied in this Circuit

---

[10]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on 30 September 1981.

thereafter in the Eighth Amendment context. See e.g., Campbell v. Sikes, 169

F.3d 1353, 1374-77 (11th Cir. 1999). Under this standard, "whether or not a

prison guard's application of force is actionable turns on whether that force was

applied in a good faith effort to maintain or restore discipline or maliciously or

sadistically for the very purpose of causing harm." Brown v. Smith, 813 F.2d

1187, 1188 (11th Cir. 1987) (internal quotation marks omitted); see also

Campbell, 169 F.3d at 1374.

Mainly the testimony of inmate Falls allows a reasonable inference to be

drawn that the Officers continued to apply force to Haggard after the threat had

subsided and that they did so in a malicious way for the very purpose of causing

harm. Before entering Haggard's cell the Officers threatened to "kick [Haggard's]

ass" and said that Haggard would be in for a "rude awakening" if the Officers had

to come into the cell.[11] Once the Officers had subdued Haggard on his bunk, they

held him there face-down while another officer pushed Haggard's head into the

mattress. After Haggard told the Officers he wished to give up and that he had

---

[11]We stress that these words -- alone -- are far from determinative of bad faith on the part of the Officers. As noted by the district court, such language is used by law enforcement officers "to attempt to defuse a situation before the actual use of force is imminent." Bozeman v. Orum, 199 F. Supp. 2d 1216, 1230 (M.D. Ala. 2002). But threatening language as part of a totality of circumstances can be relevant to what is constitutionally reasonable or, as in this case, to the determination of reasonable inferences about the Officers' subjective state of mind. See Evans v. Stephens, 407 F.3d 1272, 1281-82 & n.12 (11th Cir. 2005).

had enough, one of the Officers replied, "Oh, we don't think you've had enough."[12] The Officers then continued to apply pressure to Haggard until Falls heard a sound like "the wind went out [of Haggard]."

On these assumed facts -- especially given the Officers' continued use of force in a manner that was severe enough to render Haggard, at the very least, unconscious <u>after</u> Haggard had surrendered -- we conclude that one could draw a reasonable inference that the Officers' use of force was for the very purpose of causing harm: excessive force.

### B. Qualified Immunity.

This Court decided in <u>Johnson v. Breeden</u>, 280 F.3d 1308, 1321-22 (11th Cir. 2002), that, where this kind of excessive force violation is established, "there is no room for qualified immunity."

---

[12]We also stress that correctional officers are not always required to credit fully and to accept every representation made to them by an inmate with whom they have been recently and actively struggling. But what was said is part of the circumstances. And we do read the record in Plaintiff's favor at this stage, that is, we accept that Haggard truly did give up and that the Officers knew it.

II.  Deliberate Indifference to Serious Medical Needs

A.  Constitutional Violation.

Plaintiff also urges a Fourteenth Amendment[13] violation arguing the Officers were deliberately indifferent to Haggard's serious medical needs. Plaintiff specifically contends that the Officers knew Haggard was either unconscious or not breathing or both when carried out of his cell and that they, despite that knowledge, failed to call for medical help, to administer CPR, or otherwise to help Haggard until fourteen minutes later.  To prevail on this claim, Plaintiff "must satisfy both an objective and a subjective inquiry.  First, the plaintiff must prove an objectively serious medical need.  Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal quotation marks omitted) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

---

[13] Again, we will analyze this claim under the deliberate indifference standard explained in Eighth Amendment case law.  "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." Marsh v. Butler County, Ala., 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (en banc).

No one disputes that Haggard had a serious medical need once his breathing was impaired and he became unconscious. To satisfy the subjective element of deliberate indifference to Haggard's serious medical need, Plaintiff must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Id.; see also Miller v. King, 384 F.3d 1248, 1261 (11th Cir. 2004) (noting, after Farmer v. Brennan, 114 S.Ct. 1970 (1994), that gross negligence fails to satisfy state-of-mind requirement for deliberate indifference); Cottrell, 85 F.3d at 1490 (same).

Demonstration of the level of subjective knowledge necessary to impute to the Officers a sufficiently blameworthy state of mind consists of two steps: the Officers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must also draw the inference." Farmer, 114 S.Ct. at 1979 (emphasis added). Whether the Officers had this level of subjective knowledge -- that Haggard was unconscious from asphyxiation between the time Haggard was carried from his cell to the time he was placed on the floor in 4 North -- "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 1981.

We conclude that the record evidence would authorize a jury to find that Haggard was unconscious and not breathing while being carried by the Officers from his cell to the 4 North corridor and to find that Haggard's condition was known to the Officers. While a jury may ultimately decide the facts differently, one can reasonably infer that the Officers -- in occupying such close proximity with Haggard as they carried him -- would have recognized what other eyewitnesses consistently testified was obvious to them: that Haggard was unconscious and not breathing. That the Officers -- throughout the time the inmates all testified Haggard appeared lifeless -- physically handled Haggard for about fourteen minutes, set him down while some of the Officers tried to open a locked door en route, and looked panicked, supports this inference. In addition, one Officer kept exclaiming, "damn, damn, damn"; and the videotape confirms that, during a portion of the Officers' trek with Haggard, Haggard was motionless with his head dangling.

We also conclude that the Officers, who knew Haggard was unconscious and not breathing and who then failed for fourteen minutes to check Haggard's condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing Haggard in a way that exceeded gross negligence. "The tolerable length of delay in providing medical attention depends on the

nature of the medical need and the reason for the delay." <u>Harris v. Coweta County</u>, 21 F.3d 388, 393 (11th Cir. 1994). A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes. Still, the right reason for the delay can make a delay of any duration tolerable.

"When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." <u>Id.</u> The Officers offer no explanation -- medical or non-medical -- for the failure to (1) check Haggard's breathing or pulse; (2) call for medical assistance; or (3) administer CPR themselves, during the fourteen minutes in question. They do offer another plausible version of the facts tending to show that the Officers actually did not know of Haggard's need, but this story is not the same thing as offering a reason -- if one accepts the Officers did know -- for the delay in giving help. We conclude, therefore, that, because of the urgent nature of the medical need in this case and because of the (lack of any) reason for the corresponding delay in care, a delay of fourteen minutes is actionable under the Constitution, given the circumstances here.

B.  Qualified Immunity.

Even though we have concluded that the Officers violated the Constitution, they are due immunity from suit "unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances."  Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002).

"[A]n official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."  Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997); accord Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990); Thomas v. Town of Davie, 847 F.2d 771, 772 (11th Cir. 1988); Aldridge v. Montgomery, 753 F.2d 970, 972-73 (11th Cir. 1985).  This general statement of law ordinarily does not preclude qualified immunity in cases involving a delay in medical treatment for a serious injury.  The cases are highly fact-specific and

18

involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when. Most cases in which deliberate indifference is asserted are far from obvious violations of the Constitution.

But the assumed circumstances here are stark and simple, and the decisional language from cases such as Lancaster obviously and clearly applies to these extreme circumstances: the officers knew Haggard was unconscious and not breathing and -- for fourteen minutes -- did nothing. They did not check Haggard's breathing or pulse; they did not administer CPR; they did not summon medical help. Given these circumstances, we conclude that the Officers were fairly warned by our case law and that the Officers' total failure to address Haggard's medical need during the fourteen-minute period violated Haggard's constitutional rights, which violation should have been obvious to any objectively reasonable correctional officer.

## Conclusion

Viewing the record most favorably to Plaintiff, we affirm the district court's denial of summary judgment to Officers Thrift, Orum, Sanderson, Wood and Wilson on both the excessive force and deliberate indifference claims.

**AFFIRMED.**

Edmondson, Chief Judge, concurring:

I concur in the judgment. And I concur in the opinion; I believe it accurately presents the current law of the Circuit. I write separately to say that I question whether the law of this Circuit on Eighth Amendment claims of excessive force is correct.

Briefly stated, I am inclined to believe that the excessive-force tort created by the Eighth Amendment has an important objective element: The correctional officer's physical conduct (force) used must be objectively unreasonable under the circumstances. So, if the conduct (force) is not outside of the borders of objectively reasonable conduct given the circumstances, the prisoner's Eighth Amendment right would not be violated no matter what the particular officer's subjective state of mind might be. Put differently, the constitutional tort -- I suspect -- requires objectively unreasonable action (force) plus a subjective, bad faith motive or intent to cause unnecessary suffering. If the officer's act in applying force is objectively reasonable, no need would exist to consider state of mind.

Because I am inclined to believe an Eighth Amendment violation based on excessive force requires objectively unreasonable force, I expect that the defense of qualified immunity can apply in cases based on Eighth Amendment excessive

21

force claims. If the force used was not force that the preexisting law had clearly established to be unreasonable given the circumstances, the defendant correctional officer seemingly should be entitled to the defense of qualified immunity on that account. After all, qualified immunity is available in most constitutional torts, including other kinds of excessive force cases.

Correctional officers are due considerable deference in how they deal with violent inmates. Our Circuit's law makes it too hard for correctional officers -- who have a tough (at times, dangerous) job and are surrounded by hostile witnesses -- to avoid suit and trial because our law focuses on the particular correctional officers' subjective motive or intent. I stress that I do not believe that the Supreme Court's decisions compel our Circuit's law to be as it seems to be now.

The question I raise here was not briefed in this case. I am also uncertain that, if the Circuit's law operated in the way that I think is likely more correct, the result for this appeal would be different on the excessive force claim. Therefore, I see no point in elaborating or sharpening or finalizing my views at this time; it seems prudent to wait for a case where we have pertinent briefing and where the outcome would doubtlessly be impacted and then to test in that context the ideas advanced for consideration today. But I do hope that this Court and the Bar will

keep the ideas that I have raised today under active review. In some cases, I am pretty sure the outcome would be affected if the law of excessive force under the Eighth Amendment was set out differently than we seem to do now, that is, if we took a tack giving real attention to an objective element (unreasonable force) as well as the subjective mental element.