DENNIS, Circuit Judge,
concurring in part and dissenting in part.
I agree with the majority’s holding that Wichita County cannot be held liable as a municipality under 42 U.S.C. § 1988 for the death of Jason Ray Brown. Actions by those with final authority for making a decision in the municipality constitute an official policy of the municipality for purposes of § 1983.[1] For the reasons given below, I believe that the alleged facts concerning Dr. Bolin’s actions present a sub-missible case of his liability for Brown’s death. However, Dr. Bolin is a contract employee of the County, not a final deci-sionmaker of the County, and as such his actions would not give rise to liability on the part of the County.[2] Sheriff Callahan is a final decisionmaker of the Wichita County Jail,[3] and this panel is bound by the panel’s decision in Brown v. Callahan, 623 F.3d 249, 252 (5th Cir.2010) (Brown I) that Sheriff Callahan was entitled to qualified immunity. I continue to disagree with the holding in Brown 7.[4] However, I agree with the majority’s implicit premise in this case that we are bound by the panel’s holding in Brown I that Sheriff Callahan lacked the requisite knowledge or notice to satisfy supervisory liability; therefore, I agree that the County cannot be held liable for Sheriff Callahan’s decisionmaking with regard to medical care administered in this case. I therefore concur in the majority’s holding as to Wichita County.
*318 However, I respectfully dissent from the majority’s decision to immunize Dr. Bolin for his own role in the death of Jason Ray Brown. The majority holds that, although Nurse Krajca was deliberately indifferent to Brown’s obviously exigent medical circumstances, Dr. Bolin should not be held liable because there was insufficient evidence that he knew his policy of nighttime inaccessibility for medical advice or authorization of emergency hospitalization would cause substantial risk of harm to prisoners due to their inadequate medical treatment at the jail. In my view, a jury could reasonably find that Dr. Bolin had a practice of intimidating nurses to prevent them from calling him or sending inmates to the hospital when they became dangerously ill; and that as a medical doctor, Dr. Bolin must have known that the effect of his conduct would be to endanger the lives of those detainees, but was deliberately indifferent to that risk. I would therefore reverse the judgment of the trial court and remand the case to allow a jury to decide whether Dr. Bolin should be held responsible for Brown’s death.
In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court recognized that the Eighth Amendment requires the government to provide medical care to inmates because the failure to do so “may actually produce physical ‘torture or a lingering death’ ” or unnecessary “pain and suffering.” Id. at 103, 97 S.Ct. 285 (citation omitted). We have held that the Fourteenth Amendment confers the same right to pretrial detainees, who have a well-established constitutional right to be free from pain, suffering, and death due to the denial of adequate medical care while they are incarcerated. Hare v. City of Corinth, 74 F.3d 633, 649 (5th Cir.1996).
A prison official may be held liable for his or her policy affecting pretrial detainees that deprives them of basic human needs, including adequate medical care, if the official knew of a substantial risk of harm to detainees but responded with deliberate indifference to that risk. Id. In such a situation, the official’s “policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.” Cozzo v. Tangipahoa Parish Council-President Gov’t, 279 F.3d 273, 289 (5th Cir.2002) (quotation marks omitted). To prevail, a § 1983 “claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.” Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). “[I]t does not matter whether ... a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk.” Id. at 843, 114 S.Ct. 1970. We do “not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault,” or, as here, a death, “ before obtaining relief.” Id. at 845, 114 S.Ct. 1970 (citation, quotation marks and alterations omitted).
“Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.” Id. at 842, 114 S.Ct. 1970 (citations omitted); see also, e.g., Gates v. Cook, 376 F.3d 323, 333 (5th Cir.2004) (same).[5] In other words, “a trier *319 of fact may infer knowledge from the obvious[.]” Farmer, 511 U.S. at 844, 114 S.Ct. 1970; see also id. (citing Wayne R. LaFave & Austin W. Scott, Jr., 1 Substantive Criminal Law § 3.7, at 335 (1986) (“[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of.”)). For instance, a defendant could “not escape liability if the evidence showed that he ... refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist[,] ... [as] when a prison official knows that some diseases are communicable and that a single needle is being used to administer flu shots to prisoners but refuses to listen to a subordinate who he strongly suspects will attempt to explain the associated risk of transmitting disease[.]” Farmer, 511 U.S. at 843 n. 8, 114 S.Ct. 1970. Knowledge is thus a question for the jury. See id. at 843 & n. 8, 114 S.Ct. 1970.
The plaintiffs have alleged that Dr. Bo-lin implemented a policy discouraging nurses from permitting access to necessary life-saving medical treatment to seriously ill pretrial detainees. There is concrete, specific evidence in the record that Dr. Bolin maintained such a policy, creating dangerous conditions for critically ill inmates in the jail. Two former jail nurses attested that Dr. Bolin discouraged them from calling him for advice at nighttime, and they described two incidents in which they consulted Dr. Bolin about an inmate’s medical condition and were instructed not to send the patient to the emergency room for treatment. When the nurses did so anyway, it led to a confrontation with Dr. Bolin in which they attested that they felt bullied and intimidated. The nurses attested that they witnessed Dr. Bolin’s similar intimidation and mistreatment of other nurses on the jail staff. Nurse Krajca, who oversaw Jason Brown’s treatment, attested that she did not send Brown to the emergency room because she did not want an “ass-chewing” from the doctor. Specifically, after Nurse Krajca ordered Brown transferred to a medical solitary cell, she *320 stated to a detention officer during a cigarette break: “Do you know what kind of ass-chewing I would get from Dr. Bolin if I sent [Brown] to the hospital in the good health that he is in?’ ”
Thus, the plaintiffs introduced evidence indicating that Dr. Bolin’s well-known policy of unavailability for consultations at night, coupled with his strong disapproval of emergency hospitalization of prisoners without his assent, created a dilemma for the nurses and caused Nurse Krajca to deny Brown necessary, life-saving medical treatment. The plaintiffs therefore introduced evidence that Dr. Bolin’s policy violated Brown’s constitutional right to emergency medical care. Accordingly, there are genuine disputes as to material facts, viz., whether Dr. Bolin by his policy knowingly created a risk of serious harm or death to prisoners, was deliberately indifferent to that risk, and thereby caused Nurse Krajca’s failure to secure for Brown the emergency medical attention that he obviously needed. In my view, a reasonable jury could find that Dr. Bolin had such a policy that created an undue risk to inmates’ health and safety, that he was deliberately indifferent to that risk, and that the policy deprived Brown of his constitutional rights and led to Brown’s death.
I disagree with the majority’s conclusion that there was insufficient evidence that Dr. Bolin knew his policy of nighttime inaccessibility would cause substantial risk of harm to prisoners due to their inadequate medical treatment at the jail. The plaintiffs presented evidence that Dr. Bo-lin’s actions endangered all inmates and that such a risk was obvious. The majority impermissibly erects a bar to the plaintiffs’ ability to demonstrate Dr. Bolin’s knowledge “in the usual ways, including inference from circumstantial evidence [and] ... the obvious.” Id. at 842-44, 114 S.Ct. 1970.
Dr. Bolin was a trained medical doctor. A jury could reasonably find that this substantial risk of harm to prisoners was obvious to Dr. Bolin. He took no steps to mitigate or otherwise prevent the serious harm that awaited inmates when they were not sent to the emergency room for their critical conditions, even though the risk was brought to his attention by the nurses on his staff. Moreover, Dr. Bolin knew that the nurses at the county jail were not equipped or qualified to administer emergency treatment on their own; even worse, Dr. Bolin had openly adopted a policy of refusing to respond to the nurses’ requests for advice and assistance. Dr. Bolin’s knowledge may be established by reference to circumstantial evidence and inferences from the concrete evidence of Dr. Bolin’s behavior and its effect. Like a prison official who “knows that some diseases are communicable and that a single needle is being used to administer flu shots to prisoners[,]” id. at 843 n. 8, 114 S.Ct. 1970, Dr. Bolin, a medical doctor, was faced with the obvious risk of inadequate care for serious medical emergencies that would arise and in fact proceeded to deliberately disregard that risk despite the nurses’ protestations. Under those conditions, the inmates were virtually certain to be denied proper medical treatment for their life-threatening conditions. A reasonable jury could find that such actions created an obvious risk of danger to the inmates in the jail’s care.
Other circuits have permitted suits to go forward against prison supervisors for their own policies of deliberate indifference to inmates’ safety and medical needs when the officials’ alleged conduct created an obvious risk. For example, in McElligott v. Foley, 182 F.3d 1248 (11th Cir.1999), an inmate with a history of stomach problems began suffering from severe abdominal pain and vomiting while incarcerated; it *321 was later determined that the inmate was suffering from colon cancer. Id. at 1251— 52. Based on telephone calls to the supervising physician and standing orders, the nurses at the prison placed the inmate on a liquid diet and gave him Pepto-Bismol, Tylenol, and anti-gas medication to treat his increasingly severe symptoms. Id. at 1251-54. The supervising physician saw him infrequently in the course of several months and did not proscribe stronger medication or order further exams, despite the inmate’s worsening symptoms. Id. The Court of Appeals held that the nurses were deliberately indifferent to the inmate’s medical needs because he was obviously in pain and in need of a more efficacious course of treatment. Id. at 1256-58. The court also held that the physician was deliberately indifferent notwithstanding the fact that the physician claimed that he did not have the requisite knowledge of the inmate’s condition. Id. at 1257-58. The physician was aware that the inmate was in considerable pain even though he saw him infrequently, and, importantly, the long delays between visits themselves caused the inmate unnecessary suffering. Id. As the court explained, the inmate “often had to wait in great pain in order even to be seen by [the doctor]. A jury could find that these delays evidence the defendants’ deliberate indifference.” Id. at 1258. The court further observed, in response to the physician’s “suggestion] that these delays occurred because of decisions by the nursing staff,” that the physician “set up the system in which the nursing staff responds, without review by [the doctor], to requests to see him.... [A]n official does not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference.” Id. at 1258 n. 7 (quotation marks omitted).
Similarly, in Clark-Murphy v. Foreback, 439 F.3d 280 (6th Cir.2006), an inmate died of dehydration in his cell during an intense psychotic episode lasting several days; jail officials filled out a psychiatric referral form but did not actively follow up on the request for psychiatric help or ensure that the inmate was capable of remaining fed and hydrated during the episode. Id. at 282-83. The Sixth Circuit held that there was a triable issue of fact as to the liability of eleven of the defendants involved, including several officers, nurses, a psychologist who saw the inmate, and a supervisor who did not respond to an email regarding the need for a psychiatric referral. Id. The court held that the various officials were not entitled to qualified immunity because “for summary-judgment purposes, [the] ... defendants could have perceived a substantial risk of serious harm to [the plaintiff]. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial. ‘Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.’ ” Id. (alteration omitted) (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970).[6]
*322 The majority’s judgment that Dr. Bolin did not know or appreciate the likely consequences of his alleged policy discouraging nurses from administering proper treatment to inmates is contrary to the Supreme Court’s pronouncement in Farmer that a jury must decide questions of deliberate indifference when a risk of harm to inmates is obvious, and it sets us apart from other courts that have confronted similar situations. Similar to the situation in the Wichita County Jail, the jail physician in McElligott set up a system by which the nurses had too much discretion to deny care and in which the physician would rarely treat the inmates himself although only the physician had the authority to prescribe more serious medications and treatments. See McElligott, 182 F.3d at 1258 & n. 7. Thus, although the physician in McElligott actually saw the patient, though infrequently, that was not determinative in the Eleventh Circuit’s view. See id. at 1258 & n. 7. Rather, the physician was not entitled to qualified immunity because he “set up the system in which the nursing staff responds, without review by [the doctor], to requests to see him” and for that reason could “not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference.” Id. (quotation marks omitted).[7] Likewise, in Clark-Murphy, the Sixth Circuit denied summary judgment to a jail psychologist and supervisor who did not respond to an email requesting care for the inmate because a jury could reasonably find that those jail officials were deliberately indifferent based on circumstantial evidence or the fact that the risk their conduct posed to the inmate’s health was “‘obvious.’” 439 F.3d at 282-83 (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970).
Here, as in the foregoing cases, the plaintiffs have submitted sufficient evidence that would allow a jury to reasonably conclude that Dr. Bolin’s alleged policy of nurse intimidation posed an obvious risk to the inmates at the Wichita County Jail. The majority impermissibly imposes a barrier to the plaintiffs’ ability to demonstrate Dr. Bolin’s knowledge “in the usual ways,” based on inference from circumstantial evidence and the obvious nature of the risk. Farmer, 511 U.S. at 842-44, 114 S.Ct. 1970. Dr. Bolin should not be permitted to “turn[ ] a blind eye” to inmates’ medical needs[8] or to “insulate [himself] ... by instituting a policy of indifference.” [9]
The circumstances surrounding Brown’s death are disturbing, but unfortunately they are not unique. Since Brown’s death, at least two other detainees, including Chelsea Bowden and Wilbert Henson, have suffered extremely serious medical mistreatment in the Wichita County Jail, resulting in Bowden’s life-threatening illness and Henson’s death.[10] Because there are genuine disputes as to material issues of fact, as well as permissible inferences and ambiguities that must be resolved in the nonmovant’s favor, Dr. Bolin was not *323 entitled to summary judgment on the record presented.

. E.g., Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

. Cf. Mandel v. Doe, 888 F.2d 783, 794 (11th Cir.1989) (holding that a physician's assistant was the "sole and final policymaker with respect to medical affairs at [a] ... prison” where "the County had entered into a Memorandum of Understanding with the health department and had established a policy that medical care for inmates at the ... prison would be provided by [the] physician’s assistant” and where he was "authorized to function without any supervision or review at all”).

. See Turner v. Upton Cnty., 915 F.2d 133, 136 (5th Cir.1990).

. See Estate of Henson v. Callahan, 440 Fed.Appx. 352, 359 (5th Cir.2011) (Dennis, J., dissenting).

. See also, e.g., Nelson v. Corr. Med. Services, 583 F.3d 522, 530 & n. 5 (8th Cir.2009) (forcing female inmate to give birth with both of her legs shackled involved obvious medical *319 risks) (citing Farmer, 511 U.S. at 842, 114 S.Ct. 1970); Vaughn v. Gray, 557 F.3d 904, 909-10 (8th Cir.2009) (holding that prison officials were not entitled to qualified immunity because it was obvious that a moderately obese and mentally unstable inmate who had consumed shampoo and begun vomiting was at risk for a heart attack, which created a question of fact for the jury) (citing Farmer, 511 U.S. at 842, 114 S.Ct. 1970); Bozeman v. Orum, 422 F.3d 1265, 1272-73 (11th Cir.2005) (delay in administering or seeking medical assistance for an inmate who appeared to have asphyxiated involved obvious risk to the inmate’s health) (citing Farmer, 511 U.S. at 842, 114 S.Ct. 1970); Lolli v. County of Orange, 351 F.3d 410, 420-21 (9th Cir.2003) (holding that prison officials were not entitled to qualified immunity because it was obvious that a pretrial detainee suffering from diabetes needed food, and that therefore a jury could find that the officials "inferred from this information that [the plaintiff] was at serious risk of harm if he did not receive the food”) (citing Farmer, 511 U.S. at 842, 114 S.Ct. 1970); LeMarbe v. Wisneski, 266 F.3d 429, 436-38 (6th Cir.2001) (holding a prison physician was not entitled to qualified immunity for his inadequate treatment of an inmate’s serious abdominal condition because he "failed to take the action that his training indicated was necessary” and "the risk of harm ... was extreme and obvious to anyone with a medical education and to most lay people” such that "a factfinder may conclude that [he] knew of a substantial risk from the very fact that the risk was obvious”) (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970); Oxendine v. Kaplan, 241 F.3d 1272, 1278-79 (10th Cir.2001) (holding that the failure to refer an inmate to a specialist after he showed signs of necrosis following a surgical procedure posed an obvious health risk).

. See also, e.g., Thomas v. Bryant, 614 F.3d 1288, 1313-16 (11th Cir.2010) (denying qualified immunity to jail officials in a suit challenging the officials' policy of indiscriminate use of chemical agents against inmates where the officials " 'turned a blind eye' to [the plaintiff’s] mental health needs and the obvious danger that the use of chemical agents presented to his psychological well-being [because] [t]urning a blind eye to such obvious danger provides ample support for the finding of the requisite recklessness”) (citing Farmer, 511 U.S. at 842, 114 S.Ct. 1970); Calderon-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 66 (1st Cir.2002) (in a prison sexual assault case, denying qualified immunity to prison officials who “followed a practice of not enforcing policies of the ... Administration of Corree *322 tion of Puerto Rico to ensure that weak, vulnerable inmates are housed separately from stronger, dangerous inmates”) (alterations omitted).

.See also Farmer, 511 U.S. at 843, 114 S.Ct. 1970 ("[I]t does not matter whether ... a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk.”).

. Thomas, 614 F.3d at 1316.

. McElligott, 182 F.3d at 1258 & n. 7.

. See Estate of Henson v. Callahan, 440 Fed.Appx. 352 (5th Cir.2011); Estate of Henson v. Krajca, 440 Fed.Appx. 341 (2011); Brown v. Wichita Cnty., No. 7:05-CV-108-O, 2011 WL 1562567 (N.D.Tex. Apr. 26, 2011).