[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10474
Non-Argument Calendar
_____

D.C. Docket No. 5:10-cv-00395-WTH-PRL


JAMES L. HAIRSTON,

                                                          Plaintiff-Appellant,

versus

IVAN L. NEGRON, M.D.,
UNKNOWN UTILIZATION REVIEW COMMITTEE MEMBERS 1 AND 2,
GILBERT MICHEL, M.L.P.,
W. COLEMAN, R.N.,
UNITED STATES OF AMERICA (FTCA),

                                                          Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 25, 2014)

Before TJOFLAT, HULL and JORDAN, Circuit Judges.

PER CURIAM:

Plaintiff-appellee James Hairston, a federal prisoner proceeding pro se, appeals the district court's grant of summary judgment on his medical care claims. Hairston's amended complaint contained deliberate indifference claims under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999 (1971), and negligence and malpractice claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-80, against five employees of the Federal Correctional Complex – Penitentiary-2, Coleman, Florida ("FCC-Coleman"), as well as the United States.

In his brief on appeal, Hairston addresses only his claims that defendant Dr. Ivan Negron acted with deliberate indifference to Hairston's serious medical condition during the time period between December 31, 2008 and August 28, 2009.  Thus, we address only that claim.[1]

After careful review of the record, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Plaintiff Hairston is incarcerated at FCC-Coleman, serving a 188-month sentence for armed bank robberies.  Defendant Dr. Negron was the clinical director

---

[1]Accordingly, all other claims are abandoned.  See Timson v. Sampson, 518 F.3d 870, 874 (11th Cir.2008) ("While we read briefs filed by pro se litigants liberally, . . . issues not briefed on appeal by a pro se litigant are deemed abandoned.").

of the FCC-Coleman medical facility and a member of FCC-Coleman's Utilization Review Committee ("URC"). The URC was the FCC-Coleman entity responsible for reviewing and approving or rejecting requests for inmate medical treatment.

We set forth the medical care provided to plaintiff Hairston during the time period relevant to this appeal:  December 31, 2008 to August 28, 2009.

## A.    December 31, 2008 Heart Attack

On December 31, 2008, plaintiff Hairston reported to the FCC-Coleman medical unit, complaining that he was experiencing hot flashes and chest pain for two days.  Hairston was seen by a physician's assistant ("PA").[2]  Hairston informed the PA:  "when I take a deep breath it hurts, when I move it hurts."  The PA tested Hairston's vital signs and performed an electrocardiogram ("EKG"), determining that Hairston was suffering from an "acute myocardial infarction of other inferior wall" (commonly called a heart attack).

After giving Hairston Aspirin, the PA had Hairston transported to the emergency room at the nearby hospital, Leesburg Regional Medical Center ("LRMC").  At LRMC, Dr. Miratiqullah Hessami examined Hairston.  Dr. Hessami performed a cardiac catheterization and discovered that Hairston's right coronary artery was 100 percent blocked, his left anterior descending artery was 50

---

[2]Hairston's medical records showed that the staff member, and others who treated him, had an "MLP" degree, which refers to "mid-level professional."  This is a term for a variety of health care positions, most often a physician's assistant.  For ease of reference, we refer to the MLP individuals as PAs.

percent blocked, and the circumflex branch of his left coronary artery was at least 90 percent blocked. Dr. Hessami confirmed that Hairston had suffered a heart attack and diagnosed Hairston with 3-vessel coronary artery disease.

Dr. Hessami and a cardiologist, Dr. Hector Garcia, cleared the blockage in Hairston's right coronary artery using a procedure known as "percutaneous coronary intervention" and stented that artery. Hairston was admitted into the hospital's critical care unit.

Two days later, on January 2, 2009, Hairston underwent a second surgical procedure, this one on the circumflex branch of his left coronary artery.[3] The next day, LRMC discharged Hairston.

On the day of his discharge, FCC-Coleman medical staff performed a physical exam on Hairston. Hairston reported weakness but no pain. He returned to his housing unit.

## B.    January 6, 2009 Heart Procedure

Three days later, on January 6, Hairston returned to the FCC-Coleman medical unit, complaining that, for the past two days, he had "experienced chest pain radiating to [his] left arm." An EKG, conducted in the prison, suggested "myocardial ischemia," also known as coronary artery disease. Hairston's treating

---

[3]The record is unclear as to whether doctors could clear the blockage in that left artery or stent the artery. Some medical records suggested that Hairston received one stent, some referred to two stents; one record indicated that the blockage of the circumflex branch of the left coronary artery "was chronic" and "not amenable to angioplasty."

4

doctor at the prison, Dr. S. Lee, notified defendant Dr. Negron of Hairston's condition. Dr. Negron spoke with LRMC cardiologist Dr. Garcia. After their consultation, Dr. Negron sent Hairston via ambulance to the LMRC emergency room.

An EKG conducted at LRMC produced normal results. A blood test showed slightly elevated levels of the enzyme troponin, a common indicator of heart damage or disease. However, this troponin level was significantly lower than it was when Hairston had his heart attack on December 31. A cardiac catheterization showed that Hairston's right cardiac artery had become blocked again, and Hairston received a "2-day stent." Hairston did not have any complications after the procedure.

After spending three days at LRMC, Hairston returned to FCC-Coleman on January 9. Upon return, he was evaluated by an FCC-Coleman registered nurse. During that evaluation, Hairston was "alert and oriented," denied any pain, and did not report any weakness.

On January12, the FCC-Coleman medical unit provided Hairston follow-up care. Dr. Rafael Roman, who worked in the medical unit, performed routine tests, blood work, and an EKG. Hairston's vital signs and heart and lung sounds were normal. Dr. Roman assessed Hairston with "coronary atherosclerosis of unspec type of vessel" and "other and unspecified hyperlipidemia."

5

## C.    January 2009 Cardiac Treatment

Hairston next reported cardiac symptoms on January 28.  Hairston came to the FCC-Coleman medical unit complaining of chest pain and numbness on the left side of his face and his left shoulder.  PA Michel Gilbert assessed Hairston by performing routine tests and an EKG.  Hairston's vital signs and heart and lung sounds were normal.  PA Michel consulted with Dr. Lee, who also worked in the medical unit.  After reviewing Hairston's test results, Dr. Lee found that Hairston's coronary atherosclerosis had "improved" since his January 12 evaluation.

Two days later, on January 30, Hairston again went to the medical unit reporting numbness on his left side.  PA Michel conducted routine tests and another EKG.  He consulted with Dr. Roman.  The EKG showed "no change," and the medical staff found no acute heart problems or neurological abnormalities.

## D.    February 17, 2009 Evaluation by Dr. Garcia

Hairston's next examination came less than three weeks later as part of Hairston's follow-up care.  On February 17, LRMC cardiologist Dr. Garcia examined Hairston at FCC-Coleman and reported that Hairston continued to suffer from 3-vessel heart disease but was "[d]oing well."[4]

---

[4]All medical records, but one, indicated that this examination by Dr. Garcia occurred on February 17.  And the one form that stated that the examination occurred in January was itself not generated until February 18, 2009.

6

On a form subsequently given to FCC-Coleman officials, Dr. Garcia made these three recommendations: (1) Hairston start receiving a heart medication, Norvasc; (2) Hairston continue receiving another heart medication, Plavix; and (3) FCC-Coleman's medical treatment decisionmakers "consider" performing a surgery on Hairston's heart, percutaneous transluminal coronary angioplasty.

The next day (February 18), Dr. Lee followed Dr. Garcia's first and second recommendations. A coronary angioplasty was not performed at that time.

E.    **March 2009 Cardiac Evaluations**

Hairston next sought treatment for chest pain on March 24. According to the record of the visit, Hairston "was instructed to wait [a] few minutes, but he did not want to wait to be seen by Medical Staff." Hairston left and "did not show again to be seen."

The next day (March 25), Hairston returned to the medical unit and PA Michel examined him. Hairston complained only of bleeding gums. PA Michel checked Hairston's vital signs and reported that they were all within normal limits. PA Michel did not notice any bleeding of Hairston's gums.

The following day (March 26) Hairston again went to the medical unit and saw PA Sonia Fernandez. Hairston complained of chest pain, "chest discomfort for over a week on and off, plus gum bleeding on and off." PA Fernandez performed routine tests and an EKG. Hairston's vital signs and heart and lung

7

sounds were normal.  The EKG indicated "[s]ome bradycardia . . . [but] no mayor [sic] changes from the last EKG on January 30, 2009."  PA Fernandez did not find any bleeding or other abnormality in Hairston's gums.  PA Fernandez instructed Hairston to: (1) "[f]ollow-up at Sick Call as Needed" and (2) "[c]ontinue with present medications till next evaluation with cardiology or Institution MD."  FCC-Coleman Dr. Lee co-signed these instructions.

Thereafter, for almost three months, from March 26 until June 16, Hairston did not complain to the medical unit of chest pain or heart problems.   Hairston did visit the medical unit on June 9, but he sought treatment for only a cut on his left ring finger.  Hairston first received treatment for this cut from PA Gilbert.  However, Hairston "got upset and refused medical treatment" from PA Gilbert.  A few hours later, PA Fernandez saw Hairston, noting that he was "refusing to be seen by the other [PA]."

## F.    June and July 2009 Cardiac Evaluations

On June 16, 2009, Hairston returned to the FCC-Coleman medical unit. Hairston complained that he had chest pain and chest discomfort for the past four days.  PA Fernandez again administered routine tests and an EKG.  Hairston's vital signs and heart and lung sounds were normal.  PA Fernandez updated Hairston's prescription treatment regimen.  PA Fernandez also arranged for Hairston to

follow-up with LRMC cardiologist Dr. Garcia.  As noted below, this evaluation occurred on July 21.

Hairston next visited the FCC-Coleman medical unit on July 3 to renew the prescriptions for his heart disease treatment regimen.  Hairston returned to the medical unit ten days later, on July 13, to obtain additional prescription renewal orders.

**G.    July 21, 2009 Evaluation by Dr. Garcia and Catheterization Recommendation**

Per PA Fernandez's June 16 request, LRMC cardiologist Dr. Garcia evaluated Hairston on July 21, 2009.  Dr. Garcia recommended to FCC-Coleman staff that Hairston receive another cardiac catheterization.  Dr. Garcia did not indicate a time within which the procedure should be performed.  Nor did Dr. Garcia suggest that the diagnostic procedure was urgent.

Also on July 21, FCC-Coleman Dr. Lee examined Hairston and found him to be alert and oriented.  Dr. Lee found that Hairston suffered from two new conditions: (1) "Benign essential hypertension" and (2) "Coronary atherosclerosis due to lipid rich plaque."  Dr. Lee updated Hairston's prescription medication regimen to treat these newly diagnosed conditions.  On the medical record, Dr. Lee requested that Hairston receive a routine cardiology consultation because LRMC cardiologist Dr. Garcia had recommended a cardiac catheterization. Dr. Lee also scheduled Hairston for follow-up in 6 months.

9

**H.      July 2009 Request for Cardiac Catheterization**

LRMC cardiologist Dr. Garcia's July 21 recommendation that Hairston receive a cardiac catheterization "was submitted to the . . . URC[] for approval." On August 3, 2009, the URC denied the request.  The official "Case Review Decision," signed by defendant Dr. Negron, stated that Hairston's "case was reviewed."  The review decision also stated that Hairston would need "close follow up by [his] primary care provider, [but] at this time, [Hairston's] procedure is disapproved, and re-submission of the request will be considered if medically indicated."  Another document in the record suggested that the URC approved the request and ordered that the cardiac catheterization be performed within 60 days. However, viewing the evidence in the light most favorable to Hairston, we consider his claims as if Dr. Negron for the URC denied the procedure on August 3, 2009, advising Hairston he recommended close follow up care and that Hairston could resubmit his request.

**I.      August 28, 2009 Chest Pain and Heart Evaluation**

Hairston stated that, during the next month, his "health continued to deteriorate to the point that [he] had no energy to get around and was forced to live between [his] pains."  However, there is no record of Hairston going to the medical unit to seek treatment during this period.

10

On the morning of August 28, Hairston, after vomiting, went to the FCC-Coleman medical unit and complained of "acute left chest pressure associated [with] lightheadedness and [s]hortness of breath."

FCC-Coleman Dr. Roman examined Hairston. Dr. Roman performed tests, an EKG, and had Hairston taken to the LRMC emergency room. This time, the EKG showed changes from Hairston's prior EKGs, which Dr. Roman described as "EKG upright T's II and AVf where they were previously inverted." Dr. Roman determined that Hairston's coronary atherosclerosis due to lipid rich plaque had worsened.

Dr. Roman noted that Hairston "presents with acute left chest discomfort described as a burning sensation on precordium associated to [shortness of breath] and left arm radiation." Dr. Roman's provisional diagnosis was "[u]nstable angina R/O MI."

At the LRMC, on the same day, Dr. Boris Todorovic evaluated Hairston. Dr. Todorovic performed routine tests, as well as an EKG and laboratory tests. Dr. Todorovic noted that Hairston's chest pain was "consistent with unstable angina due to coronary artery disease." The EKG showed "old inferior wall MI [myocardial infarction]." A test of Hairston's heart rate showed "[r]egular rate and rhythm." On Hairston's treatment plan, Dr. Todorovic wrote: "[i]f the work-up for [coronary artery disease] is negative and I believe this gentleman needs a heart

11

catheterization, he should get a CT angiogram following that procedure."

Subsequently that same day, LRMC cardiologist Dr. Garcia saw Hairston and carried out three diagnostic procedures: (1) left heart catheterization; (2) left coronary angiogram; and (3) left ventrioulogram. After completing these procedures, Dr. Garcia reported that Hairston's left anterior descending artery showed "evidence of approximately 30%-40% obstructive lesion" and the right coronary artery showed 20%-30% "nonobstructive plaquing." The other arteries and valves of Hairston's heart were unobstructed. Dr. Garcia diagnosed Hairston with "[c]oronary artery disease involving a very small circumflex, which fills from the right to collateralization" and recommended that "medical therapy should be continued." Dr. Garcia did not recommend surgery.

The next day, LRMC Dr. Jose Rosado performed an ultrasonic procedure on Hairston. Dr. Rosado concluded that Hairston's heart had normal systolic function, that his "cardiac chambers and valvular structures [were] of normal appearance," and that there was "no significant regurgitants or stenotic lesions . . . across any valvular structures" other than "trace mitral and tricuspid [valve] regurgitation."

That same day, Hairston returned to FCC-Coleman. Upon return, he was evaluated by an FCC-Coleman registered nurse. Hairston did not make any complaints and appeared alert and oriented.

Throughout the remainder of 2009, Hairston continued to visit the FCC-Coleman medical unit with complaints of chest pain. These visits continued into 2010 and resulted in Dr. Garcia performing another cardiac catheterization on February 3, 2010. The procedures Dr. Garcia performed on February 3, 2010 were: (1) left heart catheterization; (2) selective coronary angiogram; and (3) left ventricular pressures.

On August 13, 2010, Hairston filed his original complaint and later requested and received leave to file an amended complaint. [5] After discovery, the defendants moved for summary judgment on all claims. The district court granted the motion. Hairston timely appealed. As noted earlier, Hairston limits his appeal to his deliberate indifference claims against Dr. Negron for acts during the time period between December 31, 2008 and August 28, 2009. [6]

---

[5]Before filing suit, Hairston in 2010 filed certain prison and FTCA grievances about his medical care. There is no claim here that Hairston failed to exhaust his administrative remedies prior to filing his lawsuit.

[6]We review a district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences in a light most favorable to the non-moving party. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005). Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Id. We review the district court's factual findings for clear error. Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010).

13

## II. DISCUSSION

### A.    Qualified Immunity

The district court concluded that Dr. Negron was entitled to qualified immunity.  The qualified immunity doctrine "protect[s] government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Youmans v. Gagnon, 626 F.3d 557, 562 (11th Cir. 2010) (internal quotation marks omitted).  Courts follow a two-part analysis when a defendant asserts qualified immunity, asking whether the plaintiff carried its burden of showing: (1) that the defendant's actions deprived the plaintiff of a constitutional right and (2) that the constitutional right at issue was clearly established at the time of the defendant's actions.  Id.

Here, we first examine whether, as Hairston asserts, Dr. Negron violated his Eighth Amendment rights.

### B.    Eighth Amendment Deliberate Indifference Principles

The Eighth Amendment forbids "deliberate indifference to serious medical needs of prisoners."  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).  "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  First, a plaintiff

14

must show that he had an objectively serious medical need. Id. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). In either situation, the need must be "one that, if left unattended, poses a substantial risk of serious harm." Id. (internal quotation marks omitted and alterations adopted).

Second, a plaintiff must demonstrate that the defendant acted with deliberate indifference to this serious medical need. Id. Deliberate indifference involves three components, specifically: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) (internal quotation marks omitted and alterations adopted).

Conduct that rises to the level of deliberate indifference includes, inter alia, grossly inadequate care and a delay in treatment. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). In "delay in treatment" cases, even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition." Harris v. Coweta Cnty., 21 F.3d 388, 394 (11th Cir. 1994). Choosing an easier but less efficacious course of treatment can also demonstrate deliberate indifference. McElligott, 182 F.3d at 1255.

15

However, a mere difference in medical opinion between the inmate and the care provider does not constitute deliberate indifference. Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). Neither does "[m]ere medical malpractice." Id.

Moreover, to prevail on a Bivens claim alleging deliberate indifference to a serious medical need, a plaintiff must show causation between the defendant's deliberate indifference and his injury. Youmans, 626 F.3d at 563.

## C.    Whether Dr. Negron Acted with Deliberate Indifference

There is no dispute that Hairston's heart condition, which necessitated repeated trips to the FCC-Coleman medical unit and the LRMC emergency room, as well as multiple heart surgeries, constituted an objectively serious medical need. However, the record—construed in Hairston's favor—did not indicate that Dr. Negron acted with deliberate indifference to that serious medical need or even create a material factual issue in that regard.

The record showed that FCC-Coleman medical staff provided Hairston with treatment each time that he complained of cardiac-related symptoms from December 2008 through August 2009. Hairston received numerous examinations, multiple EKGs, multiple cardiac catheterizations, necessary and updated prescription medications, and two surgical procedures. He received this care from nurses, PAs, FCC-Coleman doctors, and LRMC physicians and cardiologists.

Given his extensive medical care, Hairston now primarily focuses on his request for a third cardiac catheterization in late July 2009. This is not a case, however, of no action or unexplained delay in treatment. We recognize that Dr. Negron disagreed with Dr. Garcia's recommendation and signed the UCR letter that denied the July 21, 2009 request. That letter, however, stated Hairston's "case was reviewed," and Dr. Negron recommended close follow up care by Hairston's primary care provider. Dr. Negron was aware that—in the seven months since Hairston's December 2008 heart surgery—Hairston had received numerous heart evaluations, multiple diagnostic and surgical procedures, and several prescription medications. Further, LRMC cardiologist Dr. Garcia did not indicate that his recommendation to perform a cardiac catheterization was "urgent." Nor was there any record evidence that the procedure was urgent. Dr. Negron's informed decision to recommend "close follow up" care rather than an immediate cardiac catheterization does not indicate that Dr. Negron deliberately disregarded a risk of serious harm to Hairston's health. Rather, it indicates a disagreement between Dr. Garcia and Dr. Negron.

And, given that LRMC did not perform this procedure—even though the LRMC had performed the procedure on Hairston twice before—there was no showing in this record that the procedure was time-sensitive. Without some evidence that the recommended third cardiac catheterization was immediately

17

medically necessary and Dr. Negron knew that, we cannot say that Dr. Negron's decision to continue "close follow up" care rather than immediately approve the catheterization procedure amounted to gross negligence.

In any event, we note that Hairston did receive the recommended cardiac catheterization on August 28. And, he received an additional diagnostic procedure on August 29. After reviewing results from these diagnostic tests, LRMC doctors—including Dr. Garcia—returned Hairston to FCC-Coleman. They did not recommend or perform any surgeries or other medical procedures. In fact, Dr. Garcia simply recommended that Hairston's "medical therapy . . . be continued." Thus, the record also does not indicate that any harm resulted from any delay in receiving the recommended cardiac catheterization.

Because Dr. Negron did not deprive Hairston of a constitutional right, Dr. Negron was entitled to qualified immunity for his discretionary decisions.

## IV.  CONCLUSION

For all of the above reasons, the district court did not err in granting summary judgment.

**AFFIRMED.**

18